N. C. Field, Petitioner, v. A. B. Thornell, Judge.

Contempt: newspaper article. During an *adjournment* in a cause on trial, an editor handed two jurors a copy of his paper to which one of the jurors was a subscriber. It had an article on the pending trial, headed "A put up job;" and in which the arrest, the apparent conclusiveness of the evidence and public indignation were referred to. It then stated that a revulsion of feeling had set in and that, now, "the majority of the sensible, thinking people took very little stock in the story told by the parties chiefly interested." It named the jurors, belittled the talk of the county attorney, and exalted that of defendant's counsel. It then proceeded to attack the standing, character, and intelligence of the state's

witnesses, and to say that while the action of a jury is uncertain, there is no doubt in the minds of intelligent men as to what the verdict ought to be, Neither the proceedings nor the evidence were given but a set of derogatory innuendoes and an inferential statement that the witnesses were in a deal to convict defendant. The two jurors read the article and one of them read part of it aloud in the jury room while the jury was deliberating. *Held*,

a      This was contempt within Code, 4460, which inhibits contempt-
2–5    uous and insolent behavior towards a court "while engaged in the discharge of a judicial duty."

b      The judicial duty is not ended by an adjournment and is not
3–5    performed until the particular case is disposed of.

**Motion to Discharge:**  WAIVER.  Where defendant moves a discharge, at the conclusion of the state's evidence, the court declines to decide it "off hand" and the defendant introduces evidence without insisting on a ruling or saving an exception, he will be deemed to have acquiesced in the conduct of the trial.

CERTIORARI *to* HON. A. B. THORNELL, Judge of the Fifteenth Judicial District of Iowa.

WEDNESDAY, MAY 25, 1898.

ON June 8, 1896, the county attorney filed an information accusing the petitioner of contempt of court, in that he published in the *Mills County Tribune* a false and scurrilous article concerning the trial of the State of Iowa against William De Ford, entitled "A Put-Up Job," and willfully and corruptly, and with the malicious intent of influencing the jury in said cause, and thereby preventing the decent and orderly administration of justice, handed a copy of said paper to each of two jurors in said cause. The petitioner entered a plea of not guilty. There was a hearing on the following day, when he was found guilty and a fine of thirty dollars imposed. Petition *dismissed*.

*P. P. Kelly* and *O. R. Patrick* for petitioner.

LADD, J.—The case of the state against William De Ford, accused of the crime of incest, was on trial in the district court of Mills county. Nearly all the evidence had been introduced, and the court had adjourned until the following

morning.. Two of the jurors, William Van Doren and James Galbraith, went to the petitioner's place of business; and he handed each of them a copy of the *Mills County Tribune,* a newspaper of general circulation in that community, and of which he was publisher. Galbraith was a subscriber, but Van Doren was not. This paper contained an article headed "A Put-Up-Job," concerning the trial, in which the arrest of the defendant, the apparent conclusiveness of the evidence, and the public indignation are referred to. It then proceeds: "But it wasn't long before there came a reaction. Curious facts and unaccountable incidents came to mind, that began to throw a shadow of doubt on the whole transaction, and very many good people became convinced that the whole thing was a farce and a put-up job. As this wore on, this conviction became stronger; and, when the case came up for trial, the majority of the sensible, thinking people of the locality where the reputed crime occurred took very little stock in the story as told by the parties chiefly interested." The names of the jurors are then given, the talk of the county attorney belittled, and that of the attorney for the defense pronounced "one of the most notable speeches we ever heard in the court rcom." One witness is said to be conceded a jail bird by the county attorney, and to belong to the penitentiary. It continues: "After the opening statements to the jury, the first witness for the state was called, it being the fellow Hobbes. His testimony was about what might be expected, coming as it did from one of the four men in the deal. Mrs. Harmer was then put on the stand, and told, of course, the story that she had been expected to tell. She told just what her husband wanted her to tell, and admitted ( ?) that everything had happened just as her husband said it did. Poor, silly thing! Everybody felt sorry for her, and there was not a few that felt she ought to be in the insane asylum instead of on the witness stand. At the conclusion of the woman's testimony the case was adjourned until yesterday, when it was again resumed. 'Doc' Lemonds, Alec McCrary,

and Frank Harmer were put on the stand when the trial was resumed, and told their little story fairly well; but, as might be expected, on cross-examination they contradicted and tangled themselves up in bad shape. The defense began its testimony yesterday afternoon and the evidence is being heard to-day. It is expected that the case will go to the jury to-night or in the morning. Of course, there is no telling what the jury's verdict will be, as juries are an uncertain quantity sometimes; but there is no doubt in our mind what it ought to be, nor do we think there is any doubt in the mind of every intelligent man who has familiarized himself with the facts in the case." The petitioner had been in attendance at court during the trial, knew the jurors and was much interested in the case. He wrote the article naming them on the day he delivered the papers. His explanation is that he published the article as a matter of news, and did not think at the time of the case, or that Galbraith and Van Doren were jurors. The article was read by these jurors, and Galbraith gave his paper to another juror, and Van Doren read a part of the article aloud in the jury room when the jurors were deliberating on their verdict.

I. The petitioner first insists that the particular offense of which he was adjudged guilty is not included in the terms of the statute. We think it comes within the purview of subdivision 1 of section 4460 of the Code which provides for the punishment of "contemptuous or insolent behavior toward such court while engaged in the discharge of a judicial duty which may tend to impair the respect due to its authority."

Coke once said: "We shall never know the true reason of the interpretation of the statutes if we know not the law before the making of them." The power to punish for contempt is recognized as inherent in all courts, and essential to the preservation of order in judicial proceedings, and to the due administration of justice. The exercise of such power may be traced as far back in antiquity as the trial by jury; and it has been well said that the experience of ages has demonstrated its compatability with civil liberty and the purest ends of justice. "It is a trust given to the courts,

not for themselves, but for the people, whose laws they enforce and whose authority they exercise." *Watson v. Williams,* 36 Miss. 331. Unless the court may protect itself in the fulfillment of its important and responsible duties for the public good, it becomes impotent and contemptible. To deprive it of that power would be equivalent to ending its useful existence. If it may not repel and punish those who impede, obstruct, or embarrass the administration of law, then no litigant may rely with any assurance upon the ability of the court to insure him a fair and impartial trial. Of what value is the right of trial by jury or of cross-examination of witnesses, if the result be controlled by inimical influences, against which there is no opportunity to contend? The language of the statute does not require us to adopt a construction which will cripple the administration of justice, and deprive parties and the state of the hearing of causes unmolested by extrinsic influences, whether within or without the actual presence of the court. That maliciously attempting to influence a juror in reaching his verdict, or in any way attempting to prevent the decent and orderly administration of justice, as charged in this case, is contemptuous behavior towards the court, tending to impair the respect due to its authority, is not questioned, nor could it be, in the light of the authorities. But it is asserted that the words "while engaged in the discharge of a judicial duty" limit such behavior to the time the court is actually in session, and to acts committed in its presence. If so, then during the intermission of court, while the trial is in progress, the jurors may be approached by friend or foe of the litigant parties, witnesses, and officers denounced or intimidated, and the judge threatened or insulted with impunity. We shall not inquire whether the legislature may thus deprive the judiciary of powers necessary to enable it to perform the duties conferred by the constitution, because such an intention will not be imputed to that body. If the statute may be said to be subject to two constructions, that in harmony with the dictates of sound public policy will always be preferred to one

inimical to the public good. The court throughout a trial is "engaged in the discharge of a judicial duty." The necessities of nature require temporary suspension of the proceedings, for all must eat and sleep. But the judicial duty is not performed until the particular case is disposed of. The purpose of the statute is that during the pendency of specific legal proceedings the court shall be permitted to administer the law according to approved rules and precedents, without molestation or interference.

II. Upon the conclusion of the evidence in behalf of the state, the petitioner moved that he be discharged. The court remarked: "I shall not decide this motion offhand. If you want to introduce any evidence, why do so; because this motion involves the case." Without insisting upon a ruling or saving an exception, the petitioner proceeded with the introduction of his evidence. With the record in this condition, he is not in a situation to complain, and will be deemed to have acquiesced in the manner of conducting the trial.

III. The article is not a fair account of the trial, but rather, as admitted, a statement of the petitioner's convictions. Neither the proceedings of the court nor the evidence is given, but comments thereon charging, in effect or by inuendo, that one witness for the state was a jailbird; another, silly and suitable for the insane asylum; that four of them were in a deal to convict the defendant; and that, whatever the jury might do, there was no doubt in the mind of every intelligent man, familiar with the facts, that it should acquit him. This was while the case was on trial, and, as the paper was published and distributed at the county seat, the petitioner must be presumed to know that the article would be likely to fall into the hands of the witnesses and jurors in attendance. The question arises, then, whether the court may, by contempt proceedings, protect witnesses from denunciation and intimidation by the public press, and the jurors from the influence created thereby, and suggestions of their proper course during the

progress of a trial. It was remarked by Lord Hardwick, in 2. Atk. 471, that "there cannot be anything of greater consequence than to keep the streams of justice clear and pure, that parties may proceed with safety both to themselves and their characters." Mr. Cooley, in his work on Torts (page 424) says: "It has also been held in many cases that the publication of an article in a newspaper commenting on proceedings in court then pending and undetermined, or upon the court in its relation thereto, made at a time and under circumstances calculated to affect the course of justice in such proceedings, and obviously intended for that purpose, may be punished as a contempt, even though the court was not in session when the publication was made." *In Re Sturoc,* 48 N. H., 428, the accused published an article referring to the prosecution and "smelling committees" in going beyond the limits of their towns, and inquiring: "How does it look to you taxpayers of New Hampshire, that your hard-won earnings should be squandered by bigots or demagogues in this way? Yet such must inevitably be the effect if certain outrageous proceedings lately instituted in the town of Sunapee are to be tolerated and sustained." The article was published in the village where the court was in session, and during the term at which the case was likely to be called for trial. The court says: "It is not, however, open to doubt that the article has an obvious tendency to bring the prosecution and the promoters of it into odium and contempt. The whole tone of the article assumes that the prosecution was illegal, oppressive, and unjust; and, in particular passages, it denounces the prosecution in opprobious and abusive terms. It must have been intended to persuade those who read it that the prosecution ought not to be maintained. If jurors, who might read the article, should adopt such views of the cause they would be improper persons to try it, and the direct effect would be to obstruct and corrupt the administration of the law. The character of the article, and the time and circumstances of the publication oblige us to find that as this was the natural, so it must have been the intended, effect of the

publication. The natural consequences of his act being to corrupt the administration of the law, the defendant cannot discharge himself by alleging that he meant no harm, and did not suppose that he was doing anything illegal." In *Littler v. Thompson,* 2 Beav. 129, a published article representing the proceedings as vexatious and the witnesses as guilty of perjury, was adjudged contemptuous. The general doctrine is stated in 2 Bishop, Criminal Law, section 259, to be that any publication, whether by parties or strangers, relating to a cause in court, which tends to prejudice the public as to its merits, and to corrupt or embarrass the administration of justice, may be visited as a contempt; and this includes reflections on the tribunal or its proceedings, or on the parties, the jurors, the witnesses, or the counsel.

We have discovered no authority denying the power of a court to punish as contempt an act which tends to impede, embarrass, or obstruct it in the discharge of its duties. The necessity for this power is that the law may be fairly and impartially administered, uninterrupted by any influence affecting the safety or tending to direct the conclusion of the judge or jurors, or preventing or interfering with the officers of the court, or intimidating or coercing witnesses in giving their testimony. Can it be that a court has no power to protect counsel from publications calculated to intimidate and prevent them from a proper defense of suitors? Is it possible that jurors, while in the discharge of their duties, may be held up before the public as without intelligence, and not reliable when forced to sit upon the trial of causes? May witnesses who are required to attend trials by compulsory process be denounced as jail birds, conspirators, and fit subjects for the lunatic asylum during the progress, because, forsooth, they may not testify in accordance with the whim or judgment of some editor? If so, then attorneys, jurors, and witnesses in attending courts must not pay heed to the fearless discharge of their duties, if they would avoid excoriation of the newspapers, but conform their conduct and testimony

to the intimations which may be thrown out in advance. Such is not law. The courts must be left free during the progress of trials to investigate, untrammeled by such influences. Newspapers cannot be permitted to invade the sanctity of the courts of justice, assail litigants, intimidate witnesses, and dictate the verdicts of jurors or the judgments of the court. The trial of De Ford was pending when the article in question was published. The petitioner had every reason to believe it would fall into the hands of the witnesses and jurors. Its natural tendency was to intimidate the witnesses in attendance of court, and to influence the jury in reaching their verdict. The judgment imposed was fully warranted by the evidence and the law.˙ *State v. Judge Civil Dist. Ct.* (La.), 14 South. Rep. 310. It must be added, however, that the courts have no power or desire to control the press in its legitimate sphere. Its freedom is jealously guarded by the law, and made secure in the constitution. It enjoys the utmost latitude in reviewing the action of the courts, and may, after the particular litigation is ended, assail, with just criticism, opinion, rulings, and judgments with the weapons of reason, ridicule, or sarcasm. "But the liberty of the press must not be confounded with mere license. Liberty of the press stops where a further exercise would invade the rights of others. This provision of the constitution does not authorize a usurpation of the functions of the courts. Under a plea of the liberty of the press, a newspaper has no right to assail litigants during the progress of a trial, intimidate witnesses, dictate verdicts or judgments, or spread before juries its opinion of the merits of cases which are on trial." *In re Shortridge,* 99 Cal. 526 (34 Pac. Rep. 227). It is seldom, however, that an honorable journalist so far forgets his self-respect as to trespass upon the rights of the judiciary, or seek to control or improperly influence its conclusions. Courts are constantly passing on questions affecting the life and liberty of the citizen, as well as the rights of property; and the freedom of the judiciary to investigate and decide is quite as important to the well-being of society as the freedom of the press. Let the

courts perform their duties unmolested, but their final judgments, as well as the manner of reaching them, are thereafter open to the world for such criticism or condemnation as taste or necessity may require. As supporting the views expressed, see *People v. Wilson,* 64 Ill. 195 ; *Fishback v. State,* 131 Ind. 304 (30 N. E. Rep. 1088) ; *Myers v. State,* 46 Ohio St. 473 (22 N. E. Rep. 43) ; *Ex parte Barry,* 87 Cal. 109 (25 Pac. Rep. 256) ; *State v. Doty,* 90 Am. Dec. 671 ; *State v. Judge of Civil District Court,* 45 La. Am. 1250 (14 South. Rep. 310 ; *State v. Galloway,* 98 Am Dec. 404, and note; *Cooper v. People,* 13 Col. 337, 373 (22 Pac. Rep. 790 ) ; *State v. Kaiser,* 8 Lawyers Rep. Ann. (Or.) 584, and note (s. c. 23 Pac. 964) ; *State v. Morrill,* 16 Ark. 384.—DISMISSED.