HENRY W. LEX et al., Appellees, v. SELWAY STEEL CORPORATION et al., Appellees; H. J. MONTGOMERY et al., Appellants.

**STIPULATIONS: Rejection by Court for Fraud.** The court may wholly reject a fraudulently induced stipulation for decree, especially when the stipulation is proffered in receivership proceedings.

**EQUITY: Restitution for Fraud.** Principle reaffirmed that equity will be swift to compel full restitution of property obtained by fraudulent means.

*Appeal from Polk District Court.*—JAMES C. HUME, Judge.

JUNE 23, 1922.

REHEARING DENIED SEPTEMBER 23, 1922.

ACTION in equity, to establish claims in a receivership pro-
ceeding. The court denied the allowance of the claims, and
claimants appeal. The facts appear in the opinion.—*Affirmed.*

*C. C. Coyle,* for appellants.

*Howard L. Bump, James M. Parsons, Guy A. Miller,* and
*O. M. Brockett,* for appellees.

FAVILLE, J.—Prior to November 19, 1918, H. H. Budke,
Robert R. Selway, and Richard A. Selway were copartners,
doing business under the firm name and style of the Selway
Steel Post Company. The business of the partnership was the
manufacture and sale of metal fence posts, and the principal
place of business was at Des Moines, Iowa. On or about the
19th day of November, 1918, the said partnership entered into
a contract with H. J. Montgomery and B. J. Cavanagh, the
appellants herein. At said time, the said Montgomery was the
representative of the credit-rating agency of R. G. Dun & Com-
pany at Des Moines, and the said Cavanagh was an attorney,
engaged in the practice of law at Des Moines. It appears that,
about the year 1911, Montgomery, Cavanagh, and one Mahedy
had organized a corporation known as the Nevada-Des Moines
Mining Company. This corporation secured certain mining
claims near the town of Pioche, Nevada. It appears that Cav-
anagh owned some 75,000 shares of the capital stock of this cor-
poration, and Montgomery and Mahedy each had 5,000 shares.
All of this stock was known as "promotion stock," and no cash
was paid into the treasury of said company therefor; but about
$50,000 capital stock was sold to outside parties, and this sum
was placed in the treasury of said corporation. After this was
done, mining operations were begun upon the property, which
consisted of the sinking of a shaft and various drillings.

It also appears that, after the money received from the sale
of stock was exhausted, a loan of some $15,000 was negotiated.
The various proceedings in this matter are not altogether clear
in the record, but it appears that Cavanagh and Montgomery,
by the foreclosure of a mortgage, acquired the ownership of all
of the property owned by said corporation, some time prior to

November, 1918. There were located upon the property at that time appliances and machinery of the value of about $2,500. No ore had ever been taken from the mine, and since 1913, any work done thereon is described in the record as "assessment work," done "spasmodically," and necessary to prevent a forfeiture of the property. The evidence of an expert in regard to the condition of this mine in November, 1918, is summed up in the expression that it was "what is generally termed as wildcat." The "mine" appears to have consisted of one "perfectly good" hole in the ground, 332.2 feet deep. On the said 19th day of November, 1918, the appellants, Montgomery and Cavanagh, who were then the sole owners of said mining property, entered into a written contract with the Selway Steel Post Company, which was then a partnership, by the terms of which the appellants undertook to sell to said partnership all of their interest in the said mining property for the sum of $25,000 and 300,000 shares of stock in a corporation to be thereafter formed. By said contract it was contemplated that a corporation with a capital stock of $1,000,000 should be formed, and that said mining claims should be conveyed to the said corporation by the said partnership. After this contract had been entered into, a corporation was organized for the avowed purpose of taking over the business of the partnership that had been known as the Selway Steel Post Company, the said corporation bearing the same name, which, however, was later changed to Selway Steel Post & Fence Company. This corporation was organized on or about the 18th day of January, 1919. The authorized capital stock was $500,000, which was, however, afterward increased to $2,000,000. Cavanagh did the legal work necessary to secure the incorporation of said company, and was made its general attorney. A large amount of stock in the corporation was sold in Iowa, and many subscriptions to stock were evidenced by promissory notes given to said corporation. No cash payment appears to have been paid appellants under the contract for the sale of the mining property; but, in August, 1919, Budke, who was one of the original partners in the Steel Post Company and a stockholder in the succeeding corporation, the Selway Steel Post & Fence Company, turned over to Cavanagh notes aggregating $30,840 face value. All of these notes had been

given for subscriptions to stock in the Selway Steel Post & Fence Company, and belonged to said corporation. The record discloses that, after said notes were turned over, and prior to the 10th of November, 1920, Cavanagh had collected from the makers of said notes the aggregate amount of $9,645.24.

In October, 1920, Henry W. Lex and Eugene C. Harlan, who were stockholders in the said corporation, instituted the original action herein for the appointment of a receiver of said corporation, and on the 10th day of November, 1920, the appellee Thomas Tobin was appointed receiver of the said corporation, and qualified, and took possession of the assets of said corporation. Subsequently, an order was made by the court in said matter, fixing March 1, 1921, as the last day for filing claims in said receivership proceeding.

On February 28, 1921, the appellant Montgomery filed his claim against the receiver, asking that the same be established in the sum of $21,500 on the liability of said corporation as indorser on certain of the notes held by the said Montgomery, which had been given to the said corporation by stock subscribers and indorsed by the said corporation to Montgomery. On the same day, the appellant Cavanagh filed his claim in the receivership proceeding, claiming the sum of $5,277.90 as due to him for attorney's fees for services rendered in behalf of said corporation.

The receiver filed an answer and cross-petition to each of said claims, alleging that the notes held by Montgomery were, in fact, owned by Montgomery and Cavanagh jointly, and that the same were obtained from the corporation fraudulently, and praying that said parties be required to account for and pay over to the receiver all money received by them on the notes that originally belonged to said corporation. The receiver also prayed that Cavanagh be required to pay back all amounts paid him as attorney for said corporation, and that he be denied any claim for attorney's fees against said corporation. A time was fixed for hearing on said matter, and in pursuance of the order of the court, all parties appeared for said hearing on the 7th day of June, 1921.

Budke and R. R. Selway each appeared by their attorneys

and filed petitions of intervention, asking the same relief as was sought by the receiver.

Before the trial of said matter proceeded, it appears that the parties entered into negotiations for a settlement, and a stipulation was dictated into the record in open court, by which it was provided that the claims of Cavanagh and Montgomery against the receiver should be dismissed; that Cavanagh should be allowed the sum of $2,500 for attorney's fees, against the assets in the hands of the receiver; that any and all suits which Montgomery had commenced on notes held by him should be transferred to the receiver; that a decree should be entered in the cause, which should provide for said matters; that Cavanagh and Montgomery should return to the receiver all notes received by them from said corporation; and that judgment should be rendered against Cavanagh and Montgomery for whatever amount of money they had received on account of any notes of said corporation that had been transferred to them, after deducting therefrom Cavanagh's attorney's fee of $2,500. Two days later, the parties again appeared in open court. The attorney for the receiver had, in the meantime, prepared a decree in accordance with the terms of said stipulation. Thereupon, oral objections to said decree were urged in behalf of Cavanagh and Montgomery, and also by the attorney for Budke and by the attorney for Selway and the corporation. It appeared in said discussion, by statement of counsel for Selway and the corporation, in open court, that the stipulation previously entered into, upon which said proposed decree was predicated, had been agreed to by Budke because of threats made to him by Cavanagh and his attorney that, unless the same was agreed to, bankruptcy proceedings would be instituted against the corporation. It also appeared that Budke personally had agreed to pay to Cavanagh and Montgomery the sum of $10,000 "on the side," if said stipulation was entered into.

Thereupon, counsel for the receiver orally moved the court that the stipulation referred to be set aside and vacated, and that the cause proceed to trial. Counsel for Budke and counsel for Selway and the corporation joined in this motion. The attorney for Montgomery and Cavanagh strenuously objected to the setting aside of the stipulation and to any trial of the cause,

and insisted that a judgment should be entered upon the stipulation at said time. This, the court refused to do, and declared that it would not be bound by nor recognize the said stipulation nor sign the proposed decree, but ordered that the cause should proceed to trial. Thereupon, Cavanagh and Montgomery and their attorney withdrew from the court room. The court proceeded with the hearing of testimony upon the motion to set aside the stipulation, and upon the issues presented by the claims of appellants and said cross-petitions.

Thereupon, Cavanagh and Montgomery immediately made application to this court for a writ of certiorari, which writ issued, and was made returnable June 20, 1921. Subsequently, a motion to quash the writ was sustained, and procedendo from this court duly issued.

Thereafter, in November, 1921, a hearing and trial was had, and a decree entered by the court finding that the stipulation referred to was obtained by threats, duress, and fraud, and was entered into upon the agreement of Budke to pay to Montgomery and Cavanagh the sum of $10,000. The court found that said stipulation "should not be approved or allowed by this court, and that to do so would work injustice upon all of the parties interested in the receivership." The court further found that the contract to convey the mining claims to the partnership was a fraud upon the latter. It also found that notes aggregating $30,840 belonging to the corporation had been delivered to Montgomery and Cavanagh without authority of the board of directors of said corporation, and that said notes had been obtained from the corporation by fraud, and that said parties should account therefor to the receiver. The court further found that Montgomery and Cavanagh had collected on said notes, in principal and interest, the total amount of $10,803.72, for which amount they should account to the receiver. The court also found that the said Montgomery and Cavanagh had in their hands four notes of $5,000 each and one note of $1,500 which they had so received, and which they should forthwith deliver to the receiver. The claim of Montgomery against the receiver was denied. As to the claim of Cavanagh for attorney's fees, the court found that $2,143.10 had been paid to Cavanagh prior to the appointment of the receiver, and that Cavanagh

was not entitled to any claim for attorney's fees against the receiver, and the same was denied. A decree in accordance with said findings was duly entered.

I. Appellants contend that, upon the foregoing facts, the trial court erred in setting aside the stipulation and refusing to be bound thereby. It is contended that the stipulation became a contract between all of the parties, which the court could not set aside, either upon its own motion or upon such a showing as was made. This is the main contention in the case.

1. STIPULATIONS: rejection by court for fraud.

The court ordered a hearing, and received evidence upon the question as to the manner in which the consent to the stipulation was obtained. The stipulation itself was attacked for fraud in its procurement, by motion. It is unnecessary that we set out the evidence in the matter.

The finding of the trial court to the effect that the stipulation was obtained in the manner claimed has abundant support in the record. There is no dispute that Budke agreed to pay Montgomery and Cavanagh $10,000 cash by the time said parties would be required to pay that amount to the receiver, under the stipulation. In other words, it was Budke who was, in reality, making restitution for appellants. It also appeared that Cavanagh, Montgomery, and their attorney had a talk with Budke about instituting bankruptcy proceedings against the corporation unless the matter was adjusted, and that this was one of the inducements to his consenting to the stipulation.

We think counsel for the appellants claims too much for their rights under the stipulation. In the first place, consideration is to be given to the fact that this was a proceeding involving a receivership. The receiver was an officer of the court, and all of his acts as such receiver were subject to the approval or disapproval of the court. Manifestly, a wide discretion is lodged in the court in matters of this kind. The parties came before the court and dictated a stipulation of settlement. When they appeared and presented a decree, objections were urged to the form in which the decree was drawn. It thereupon appeared before the court, for the first time, that it was claimed that the stipulation had been procured by the means suggested. The court itself was rightly interested in the matter of this

stipulation, because it directly involved its receiver and, through him, all of the parties interested in said receivership. When the claim of irregularity and fraud in this matter was brought to the attention of the court in the manner in which it was, by motion of counsel and in the presence of all of the parties, it was not only within the discretion, but, as we view it, it was the duty of the court to proceed to investigate the claim so made, with respect to the manner in which the stipulation had been procured. A court could not well shut his eyes to the situation and acquiesce in a decree under such circumstances. The manner of procedure may not have followed the strictest technical nicety, but all of the parties were before the court, presenting a decree in accordance with the stipulation, when the validity of the stipulation was impeached by counsel. In addition to that, a formal motion was made that the stipulation be set aside, and that the court proceed to hear the facts in regard to the manner in which the stipulation was procured. The appellants, by objection made of record, sought at said time to have said motion overruled, and to have a decree entered on said stipulation. The court had fairly before it, with jurisdiction of all of the parties and the subject-matter, the question of determining whether or not a hearing should be had at said time upon the question of the alleged fraudulent manner in which the stipulation had been procured. To hold that a trial court, upon such a record, could not entertain such a motion to vacate a stipulation for fraud and illegality in its procurement, would render such tribunal helpless to protect itself, its duly appointed officers, or the litigants before it, from fraud and imposition practiced practically in open court. A large discretion is necessarily vested in the trial court under such circumstances. There was no abuse of such discretion in the instant case. On the contrary, we think that the action of the lower court in refusing to sign the decree in pursuance of the stipulation, without an investigation and hearing in regard to the manner in which the stipulation was procured, was, under the circumstances disclosed, a most proper proceeding. As bearing on this question, see *Garretson v. Altomari*, 190 Iowa 1194. See, also, 36 Cyc. 1294, and cases cited therein.

II. Appellants contend that the court erred in finding

that the contract between Cavanagh and Montgomery and the partnership, for the transfer of the mining property, was fraud-

2. EQUITY: restitu-  ulent, and in requiring a restoration of the
tion for fraud.   notes and proceeds thereof which were received
by appellants from the corporation.

In the first place, it is to be noticed that all of the notes that were turned over to the appellants under the contract of November 19, 1918, were notes that belonged to the corporation, the Selway Steel Post & Fence Company. There was an utter lack of any evidence to show any authority on the part of the directors of said company, or anyone acting legally in behalf of the corporation, to transfer these notes to the appellants.

It is unnecessary that we repeat in detail the evidence with regard to this transaction. Two things plainly appear in connection therewith. One of these is the obvious fact that the appellants were the owners of an abandoned and worthless mining claim in Nevada; the other is that the parties concerned in promoting the new corporation, known as the Selway Steel Post & Fence Company, were exceedingly desirous of securing a favorable rating from a commercial agency, which they could use in the business of promoting the sale of stock in the new corporation. As the result of this transaction, the appellants disposed of the practically worthless "mining claim" in Nevada for the not insignificant sum of $25,000.

On the other hand, while it is not so recited in the contract, it is perfectly obvious from the evidence that all parties to the deal contemplated securing a favorable rating report on the Selway Company at the hands of Montgomery, the R. G. Dun & Company agent.

The goddess Justice is pictured as being blindfolded. It would require an interference with other senses as well, to render it impossible to detect the evidences of fraud in this transaction.

Budke testified that one reason for purchasing the property was "in order to *please* him" (Montgomery). It is also said by Budke that he anticipated that Montgomery "would have to do a lot of extra work" in connection with making reports in regard to the financial condition of the company.

It appears that the salesmen engaged in the sale of the stock

of the corporation were furnished with what appears to be technically known to the trade as a "kit." This contains a prospectus and other printed matter regarding the company and its prospects. This "kit" was displayed to prospective subscribers to stock in the corporation. Included in the literature within said "kit" was a letter purporting to be written by Montgomery, as manager of the R. G. Dun & Company Mercantile Agency at Des Moines, and assuming to be a report on the financial condition of Budke and the Selway brothers. This letter contains the flattering statement that Selways have available assets over their liabilities of over $1,000,000, and that Budke has considerable property also. How many such reports Montgomery made, as the "extra work" which Budke anticipated he would be called upon to do, does not appear in the record.

The decree of the trial court in requiring full and complete restitution to the receiver of the assets of the corporation which had passed into the hands of the appellants, under this contract, was essentially equitable. It has always been the pleasure, as well as the duty, of a court of equity to thwart attempted fraud and wrongdoing, and to compel full and complete restitution of property obtained by illegal and fraudulent means, where it is within the power of the court so to do. The decree of the trial court in this regard was correct.

III. Complaint is made of the denial of the claim of the appellant Cavanagh for attorney's fees. The court found that the sum of $2,143.10 had been paid by the said corporation to said appellant for services prior to the appointment of the receiver, and allowed the same to stand, but disallowed the appellant any fees under his claim filed in the receivership proceeding.

We have examined the record in regard to this claim for attorney's fees. This was a matter peculiarly within the province of the trial court. We think that the amount previously paid by the corporation to the claimant Cavanagh was rightly found to be a fair and reasonable fee for the services performed. We find no sufficient basis in the record to warrant us in interfering with the conclusion of the trial court in rejecting the claim filed with the receiver.

The decree of the trial court throughout appears to us to

be supported by the evidence in the case, and to be equitable and just.

It should be, and it is, in all respects,—*Affirmed.* .

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.