AUSTIN HAINES, Petitioner, v. DISTRICT COURT OF POLK COUNTY (JAMES C. HUME, Judge), Respondent.

CONTEMPT: Elements—Newspaper Comments. Caustic newspaper comments on the individual idiosyncrasies and temperamental unfitness of a trial *judge* do not constitute contempt, when such comments are not calculated to embarrass or obstruct the *court* in the administration of justice.

Headnote 1: 13 C. J. p. 36 (1926 Anno.)

*Certiorari to Polk District Court.*—JAMES C. HUME, Judge.

FEBRUARY 17, 1925.

PROCEEDING in certiorari, to review the order of the district court in and for Polk County, Iowa (James C. Hume, presiding judge), adjudging the petitioner, Austin Haines, guilty of con-

tempt of court, predicated on a publication on June 27, 1922, by the said petitioner in the Des Moines Daily News. The court imposed a fine of $1.00 and imprisonment for one day in the Polk County jail. The material facts are stated in the opinion. *Reversed.*

*Carr, Cox, Evans & Riley,* for petitioner.

*H. W. Byers, John G. Myerly,* and *M. J. Mulvaney,* for respondent.

*Joseph Brody* and *E. D. Perry, Amici Curiae.*

DE GRAFF, J.—The alleged contempt is predicated on a publication, to wit:

"It is perhaps ungracious to criticize a man who has furnished so much of what we newspaper slaves call 'hot copy' as Judge Hume. But for months I have had a growing feeling of disgust with the opinions which he has handed down—a feeling which I believe is shared by the bar and the public in general. Filled with puerile personalities and what the lawyers call 'obiter dicta,' they have presented a strained effort at humor and sensationalism wholly unbecoming in a judge who of all men should be the last to become intoxicated by the exuberance of his own verbosity. They remind me of nothing so much as the labored efforts of a village smart alec. His opinion in the street car franchise case is an instance in point. With his conclusions I have no quarrel, for Judge Hume is learned in the law and I am not. He is an able lawyer and a profound student of human affairs in general, but I regret that he is not a candidate for election that I might have the pleasant duty of opposing him as a man temperamentally unfitted for the bench."

The adjudication giving rise to the instant proceeding is bottomed on Section 4460, Code of 1897, which reads:

"The following acts or omissions are contempts, and are punishable as such by any of the courts of this state, or by any judicial officer, including justices of the peace, acting in the discharge of an official duty, as hereinafter provided:

"1. Contemptuous or insolent behavior toward such court while engaged in the discharge of a judicial duty which may

tend to impair the respect due to its authority; * * *.''

The primary question then is: Does the foregoing publication, within the purview of the statute, constitute contemptuous or insolent behavior toward the court while engaged in the discharge of a judicial duty, and such as to impair the respect due to its authority?

The only opinion of the presiding judge specifically mentioned in the published article refers to what is termed the ''Street Car Franchise Case.'' This opinion was filed with the clerk of the district court on the day preceding the publication in question, and is part of the record before us. There was also introduced and made a part of the record one other opinion of Judge Hume's, filed on May 6, 1922, in a case entitled *''Lex v. Selway Steel Corporation,''* 194 Iowa 193.

The petitioner contends that the comments made by him as the city editor of the Des Moines Daily News on the opinions of Judge Hume were proper and justifiable, and that the language of the court as used in the opinions aforesaid was such as to invite comment by the press. It will be observed that the challenged article recites and declares that the writer (petitioner herein) has no quarrel with the legal conclusions reached by Judge Hume, and that he recognized him as learned in the law and a profound student of human affairs in general. In brief, it is the claim that the publication in question referred only to the temperamental qualities of Judge Hume and his literary and humoristic idiosyncrasies.

It is too plain for amplified statement that a court has the power to punish acts which tend to diminish a proper respect for its authority, or which interfere with the performance of duties affecting public or private rights. However, there is another angle of vision in the consideration of a case of this character, that involves the preservation of personal liberty in relation to the freedom of speech and of the press, finding expression in constitutional guaranty. The question presented is not without difficulty, since a court of review is called upon to define not only an alleged contempt, but also the reasonable limits of the constitutional guaranty, under the record facts.

Our state Constitution provides:

''Every person may speak, write and publish his sentiments

on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech, or of the press." Article 1, Section 7.

The article in question does not attack or attempt to impeach the character and integrity of the presiding judge. The only reference to him as a judge, or his fitness for the responsible office, is in the line in which the writer asserts that it would be "a pleasant duty of opposing him as a man temperamentally unfitted for the bench," in the event that he was a candidate for office. This statement in itself neither tended to obstruct the course of justice nor to prejudice the trial of any pending action or proceeding. The right is well defined that the merits and qualifications of a candidate for public office, including judicial office, may be discussed by the press.

At the threshold of this case, it is essential to note the elements of the definition of contempt which must find application to the particular facts which constitute the alleged contempt. At common law, a criminal contempt was defined as any act which tends either to obstruct the court of justice or to prejudice the trial in any action or proceeding then pending in court. We are, however, not dealing with the common-law rules in these matters, but with a statute. *Drady v. District Court of Polk County*, 126 Iowa 345; *Barber v. Brennan*, 140 Iowa 678. It is universally recognized that the power to punish contemptuous acts is inherent in the court, and "arises by implication from the very act of creating the court. A court without this power would be, at best, a mere debating society, and not a court." *State ex rel. Atty. Gen. v. Circuit Court for Eau Claire County*, 97 Wis. 1 (72 N. W. 193).

Since the power to punish for contempt is arbitrary in its nature and summary in its execution, it must be measured and limited by the necessity which calls it into existence; and our statute does not attempt or intend to destroy or impair the power of a court to punish for contempt. On the contrary, it recognizes the power as inherent in the court, and a part of its very life, and a necessary incident to the exercise of judicial function. A court may well challenge the authority of a legislature to destroy or sensibly impair the power of a court to punish for contempt; but limitations placed thereon by statute are univer-

sally recognized as valid. With the rules of the common law, however, involving what is termed the scandalizing of the court, we are not concerned. The classification of contempts by Lord Hardwicke (*Roach v. Garvan* [*or Hall*], 2 Atk. 469 [26 Eng. Rep. R. 683]) has undergone a change in England, and committals for contempt by scandalizing the court have become obsolete in that country. It is said in *McLeod v. St. Aubyn,* 68 L. J. R. (Privy Council Cases) 137 (1899):

"Courts are satisfied to leave to public opinion attacks or comments derogatory or scandalous to them."

It is well settled in this state that the power to punish for contempt may only be exercised that the law may be fairly and impartially administered, uninterrupted by any influence affecting the safety or tending to direct the conclusion of the judge. *Field v. Thornell,* 106 Iowa 7. So long as published criticism does not impede the due administration of the law, it were better that we maintain the guaranty of our Constitution, than undertake to compel respect to punish libel by the summary process of attachment for contempt. *State ex rel. Metcalf v. District Court,* 52 Mont. 46 (155 Pac. 278); *State v. Sweetland,* 3 S. D. 503 (54 N. W. 415); *Cheadle v. State,* 110 Ind. 301 (11 N. E. 426.)

As indicated heretofore, our courts have not been drawn into the vortex of constructive contempts, as defined by the earlier common law; and we have construed many of such acts to have no tendency to obstruct the administration of justice, but simply to wound the feelings or offend the personal dignity of the judge. The latitude of contempt which finds expression in the earlier decisions is not in harmony with the genius of our life or the spirit of our institutions. The primary purpose of a contempt proceeding is to vindicate the integrity and independence of the court. The judge is the judicial administrator; but it is not he who is aggrieved. His own personal feelings are not in the case. It is the court; not the individual.

True, every published impeachment involves the personal, as well as the official, phase; but the criticism must impede the due administration of law. The power to punish for contempt is a trust imposed in the courts, not to protect the individual judge, but the people, whose laws they interpret and whose

authority they exercise. *Watson v. Williams,* 36 Miss. 331. As said in *State v. Sweetland,* supra, it would be a perversion of the salutary doctrines governing the proceedings of courts and its power to punish for contempt, to permit a judge to summon before him and punish by fine and imprisonment one who challenges in a public newspaper his learning, integrity, or impartiality as a judge, except when the interests of the state demand it, to vindicate the independence and integrity of the courts and protect them from publications directly calculated to embarrass, impede, intimidate, or influence them in the due administration of justice in proceedings pending before them.

In *Dunham v. State,* 6 Iowa 245, Wright, C. J., speaking for the court, said, in construing the instant statute:

"It would be a perversion of the entire language used, and a palpable violation of the spirit and policy of the provision, to say that a judge could bring before him every editor, publisher, or citizen who might, in his office—in his house—in the streets—away from the court, by printing, writing, or speaking, comment upon his decisions, or question his integrity or capacity. The law never designed this. It is not thus that an independent and intelligent court will be apt to secure public confidence. * * * No court can or should hope that its opinions and actions can escape discussion or criticism. * * * It is perfectly competent and lawful for anyone to comment upon the decision and expose its errors and inconsistencies. * * * It is insisted, however, that the courts of this state may punish other acts and omissions as contempts, than those mentioned in the Code. We are strongly inclined to think, however, that the provisions of the Code upon this subject must be regarded as a limitation upon the power of the courts to punish for any other contempts."

See, also, *State v. Anderson,* 40 Iowa 207; *In re Pryor,* 1⁓ Kan. 72 (26 Am. Rep. 747.)

The Supreme Court of the United States declared that, when a case is finished, courts are subject to the same criticism as other people. *Patterson v. Colorado ex rel. Atty. Gen.,* 205 U. S. 454 (51 L. Ed. 879).

We do not condone the press when it transcends the limits of decent criticism. Newspaper license under the guise of constitutional guaranty is not within the purview of the freedom of

the press; but whether a publication is contemptuous or not must be determined by the facts in the particular case. It must be an act calculated to embarrass or obstruct the court in the administration of justice, to come within the definition of contempt; and the statutory limitation of this power, rather than its enlargement, tends to strengthen the judiciary and attach to it the affections and esteem of the people. If every adverse criticism on the official conduct of a presiding judge constituted contempt of court as such, it would prevent all public or private discussion of court doings. *Stuart v. People,* 4 Scam. (Ill.) 395.

We make but brief reference to the opinions of record in the case at bar, but content ourselves in stating our conclusion. The *Selway* case involved the liquidation of an insolvent corporation, and the primary evidence concerned itself with the fraud practiced by its promoters in obtaining property and promissory notes from numerous individuals. The opinion covers some 20 pages of the abstract. It dealt, in the first instance, with data pertaining to the history of the United States and this state, with allusion to the flora and fauna of Iowa. This was the basis for the recital of an imaginary visit of a stranger from Wisconsin (Selway), and is termed "the arrival of Vandemark,"—the hero of Herbert Quick's novel. Then follows a history of Budke, the partner of Selway; but to recount the details of the cunning scheme, as told by Judge Hume in his figurative recital of the facts, would serve no purpose here. The opinion is readable, and quite interesting, from a literary viewpoint, but unusual in the realm of judicial opinion. The story of the *Selway* case not only is told in the opinion, but it is dramatized by the judge; and, as said by him, "the characters are real people," appearing in person as witnesses on the trial; and, as indicated by the judge, the story made an interesting sequel to "Vandemark's Folly." The program, as outlined, is as complete as ever printed for theater comedy, including scene, time, and *dramatis personae*. It is vivid in word painting and colorful in characterization.

In the opinion in the street car franchise case, the judge also gave full rein to his imagination and literary inventions; and the statement in the publication, "the exuberance of his own verbosity," finds its origin here. It is quite evident that it is

the manner of saying, and not the thought intended to be conveyed, that provoked the newspaper comment of which the petitioner is the author. After a careful reading of the opinions by Judge Hume as found in the record before us, we feel that the published article would in no manner influence the court in any pending matter. Both opinions had been filed, and became subject to public inspection and to public and individual comment. The ruling of the court was not criticized, nor the reasoning of the court in reaching its conclusion. The comments of the petitioner find their provocation in the literary style of the author. Rule 21 of the proposed Canons of Judicial Ethics, reported by a committee of which Chief Justice Taft is the chairman, reads:

"Justice should not be moulded by the individual idiosyncrasies of those who administer it. A judge should adopt the usual and expected method of doing justice, and not seek to be extreme or peculiar in his judgments, or spectacular or sensational in the conduct of the court."

To violate this canon is to invite comment by the press.

We conclude that the publication in question, in the light of the opinions which were the subject of comment, is not within the purview of contemptuous and insolent language toward the court in the performance of a judicial duty, and such as to impair the respect due to its authority.

The judgment is—*Reversed.*

FAVILLE, C. J., and ARTHUR, VERMILION, and ALBERT, JJ., concur.

EVANS, J., takes no part.