## IN THE MATTER OF WILLIAM C. STUROC.

The publication of an article in a newspaper printed and circulated in the place where a court is sitting, reflecting in severe and opprobrious terms on the character of a criminal prosecution then pending in the court and stand-ing in order for trial,—if the publication is made at a time and in circum-stances such as would naturally bring it to the notice of jurors and others who are in attendance on the court,—is a contempt of court, and punishable as such by summary process.

THIS was a rule to show cause why an attachment should not issue for contempt of court in publishing in the *New Hampshire Argus and Spec-tor*, a newspaper printed in Newport in this county, of the issue of Sep-tember 6, 1867, an article signed " A Member of Sull. Co. Bar."

The following facts appeared in the case:    The respondent is an at-

torney and counsellor of this court, residing at Sunapee in this county. On the 20th of July, 1867, George W. Nourse and William H. Sprague, of Newport, made complaint before Isaac A. Reed, a justice of the peace, against Welcome A. Angell, of Sunapee, for keeping intoxicating liquors for sale contrary to law. On the same day the justice issued a search warrant, which was returned before the justice, finding on the premises of Angell, in Sunapee, a quantity of spirituous liquors, which the justice adjudged to be of greater value than $13.33, and thereupon transferred the case to the trial term of this court to be held at Newport on Tuesday the third day of September, 1867. The justice ordered personal notice to Angell, and a publication of notice in the *Argus and Spectator*, a newspaper printed at Newport. The personal notice was given, and notice published in the *Argus and Spectator*, in the issues of the 2nd and 9th of August, 1867. The cause was entered at the September term of this court, and was pending there on the 6th of September, when the article in question was published. The article, which is the foundation of this proceeding, is as follows:

[For the Argus and Spectator.]

PROSECUTIONS UNDER THE PRESENT LIQUOR LAW.

Messrs. Editors.—On a careful examination of the act entitled " An Act for the Suppression of Intemperance," I could not avoid coming to the conclusion—if the ordinary rules of construction and interpretation are to prevail—that the law referred to has been but imperfectly analyzed by some who desire to aid in its enforcement, and in the cause of temperance.

Section 20 of the act of '55, provides :—" It shall be the duty of the Mayor and Aldermen of every city, and the Selectmen of every town or place to prosecute at the expense of such city, town or place, every person guilty of a violation of any of the provisions of this act, of which they can obtain reasonable proof; but nothing in this section shall be construed to prevent any person from making complaints, and instituting and carrying on prosecutions under this act; and police officers are hereby authorized to serve all warrants and notices issued under the provisions of this act."

And Sect. 21, Chap. 100, of the " General Statutes," passed last June, contains a less verbose but equally explicit provision to the same effect.

In view, then, of the spirit, and still more, of the letter, of the statute provisions on this subject, we beg leave to ask the " smelling committees " of some towns in Sullivan County, where they find their authority for going beyond the limits of their own towns?

The first clause of the sections we have just quoted, makes it the duty of the Selectmen to prosecute *at the expense of the town* all cases arising within their own towns, and then as contradistinguished from *the officers of the town*, it provides that " *any person*," meaning, beyond a doubt, any person in town, may make complaint and " institute prosecutions for such offences." For let it be noticed distinctly that no

other provision is made for the payment of the expenses of prosecuting except that provided in Sects. 20 and 21, referred to.

In all cases, the town where the complainant or prosecutor resides, be he Selectman or "other person," shall pay the expense of such prosecution.

If this be not the true construction of the statute, then it follows that litigious and meddlesome persons in any town might involve their respective towns in immense bills of costs and expenses, out of the limits of their own towns, and even of their own counties.

For, if under the present law, "any person" being the substitute for the Selectmen of "every town," can go out of their own to vamp up prosecutions, or persecutions, then they can as well go out of the County; and if out of the County, then all over the State. Does any sane man believe that that was ever intended to be the effect of the law? Does any inhabitant of Newport, or Claremont, or any other town in the State, like the idea of being made, as a town, liable to pay the expense of fanatical prosecutions under this or any other similar law?

How does it look to you tax-payers of New Hampshire, that your hard-won earnings should be squandered by bigots or demagogues in this way? Yet such must inevitably be the effect, if certain outrageous proceedings lately instituted in the town of Sunapee are to be tolerated and sustained.

We hold it too clear for question, that by the provisions of the law, the Selectmen of every town, or any person as their substitute, in that town, may prosecute offences against the law in that town, but that by the law they cannot go beyond the limits of their respective towns; for the simple reason that one town might be made in this way to foot the bills for prosecutions all over the State, which is ridiculous, unjust and preposterous.

But as another reason why no such power can be legally exercised under the present law, we offer the argument of every advocate of a "State Constabulary" within the last year. Has it not been asserted that under the present law there was no general power to prosecute or enforce the law? and that that was the grand and conclusive argument in favor of a set of general officials, empowered to prosecute anywhere within the State? Unless our ears have falsified, this has been the recent talk of "temperance" men. But if officious meddlers can proceed as some have lately assumed to do, then all this ponderous reasoning in favor of a "pantry inquisition" falls to the ground, and Mr. Church, and other churches, have had their labor for their pains.

In fine, is it not disreputable, in this age of vaunted freedom, that, by false and forced construction of a statute, bad enough at best, the private security of the citizen should be ruthlessly invaded, and his home, which the English under Magna Charta, hold to be their "sacred castle," and which the American people should be equally careful to defend and protect—should be entered and despoiled at mid-day, and yet no signs of resistance to such oppression be heard or seen?

                                   A MEMBER OF SULL. CO. BAR.

Newport, Sept. 1867.

After the publication of this article and during that term the court made a rule on the respondent to come in and show cause why process of contempt should not issue against him. He came in accordingly, filed his affidavit and submitted to interrogatories. He admits that he wrote the article and presented it for publication; that he knew of the seizure and the proceedings before the magistrate; that he read the notice published on the 2nd and 9th of August; that the legal proceedings mentioned in the article were the same with those pending in court. But he denies that he knew, when he wrote the article, that the proceedings were pending; that he intended to obstruct the administration of justice, or to do any thing more than he supposed he had the legal right to do.

A. G. Carlton, publisher of the *Argus and Spectator*, testified that when the defendant left the article for publication, he said he was not particular that the article should be published that week, and did not care if it were not published at all.

PERLEY, C. J. There can no doubt, and it is indeed admitted, that the publication complained of related to the prosecution then pending against Angell. The respondent says he did not know, when he wrote the article, that this prosecution was pending in court. It may have been his idea that no proceedings were then pending in a technical, legal sense; but he must have understood by the notice, which he read, if not otherwise, that the cause was to proceed in this court, and be entered at that term, unless in some way adjusted or abandoned. He knew that whether the proceedings instituted at Sunapee were to be sustained would be determined in the court to which they had been transferred on the adjudication of the justice that he had no jurisdiction, and that the cause would be in order to be heard and decided at that term. The article itself plainly implies that the question was pending and was to be determined, whether "certain outrageous proceedings lately instituted at Sunapee were to be tolerated and sustained." And there can be no doubt that the article was written and published in reference to that individual case.

The evidence shows that the respondent did not insist on the article's being published that week, and was indifferent whether it was published then, or later, or not at all; he however wrote the article and authorized the publication, and must be held responsible for it.

The article was published in a newspaper of the village where the court was held, while the court was in session and during the term at which it was likely to be tried by the jurors then in attendance. All persons attending the court and interested in the business would be in the way of reading the article and could hardly fail to know that it referred to that pending prosecution. This no one would understand better than an intelligent member of the legal profession, like the respondent, resident in the county and perfectly well acquainted with all the local circumstances. He must have been aware that the article would be read by jurors and others attending on the court, and must stand charged with the natural and necessary consequences of the publication.

He denies indeed all intention to interfere improperly with the administration of the law, and all that we know or have heard of him justifies us in giving full credit to his assurance that he did not suppose he was doing any thing more than he had a right to do.

It is not, however, open to doubt that the the article has an obvious tendency to bring the prosecution, and the promoters of it, into odium and contempt. The whole tone of the article assumes that the prosecution was illegal, oppressive and unjust; and in particular passages it denounces the prosecution in opprobrious and abusive terms. It must have been intended to persuade those who read it, that the prosecution ought not to be maintained. If jurors, who might read the article, should adopt such views of the cause, they would be improper persons to try it; and the direct effect would be to obstruct and corrupt the administration of the law. The respondent may have had so strong an opinion against the policy of the law on which the prosecution was founded, and so lively a sympathy with a townsman whom he believed to be unjustly prosecuted, that he would think it right and legal to take this course to accomplish his deliverance. The character of the article and the time and circumstances of the publication oblige us to find that as this was the natural, so it must have been the intended effect of the publication. The natural consequences of his act being to corrupt the administration of the law, the defendant cannot discharge himself by alleging that he meant no harm, and did not suppose that he was doing any thing illegal.

Since this matter has been brought to the notice of the court, we should be wanting in one of our plainest duties, if we failed to take such order in the case as will be likely to discourage a repetition of conduct, which, if it should become habitual, would make all the rules which have been so carefully devised to ensure fair and impartial trials on the law and evidence wholly unavailing. We are happy, however, in being able to give the respondent full credit for his assurance that he had no ill intention; and we hope that the ends of justice will be answered by a mild judgment, since enough will be done to show that such publications in such circumstances are illegal and cannot be tolerated.

It must not be inferred that we question the right to criticise and censure the conduct of courts and parties when causes have been finally decided. The question in this case is whether publications can be permitted, which have a tendency to prejudice the decision of pending causes. The publishers of newspapers have the right, but no higher right than others, to bring to public notice the conduct of courts and parties after the decision has been made; and, provided the publications are true, and fair in spirit, there is no law, and I am sure there is no disposition, to restrain or punish the freest expression of the disapprobation that any person may entertain, of what is done in or by the courts.

The law on this subject is extremely well settled in this State and elsewhere. *Pool v. Sacheverel*, 1 P. Will's 675; *Mrs. Farley's Case*, 2 Ves. Sen. 520; *Anonymous*, 2 Atkins 469; *Parry's Case*, 2 Atkins 469; *Roach* v. *Hall*, 2 Atkins 469; *Rex* v. *Clement*, 4

B. & Ald. 218; *Respublica* v. *Oswald*, 1 Dallas 319; *People* v. *Freer*, 1 Caines 518, 484; *Bronson's Case*, 12 Johns. 460; *Yates* v. *Lansing*, 9 Johns. 417; *Respublica* v. *Passmore*, 3 Yeates 438; *Tenney's Case*, 23 N. H. 165; *State* v. *Matthews*, 37 N. H. 450.

The respondent was adjudged to pay a fine of thirty dollars.