KUTV, INC., Deseret News Publishing Company, KSL AM and TV, a Division of Bonneville International Corporation, and Society of Professional Journalists, Sigma Delta Chi, Utah Chapter, Plaintiffs,

v.

Honorable Dean E. CONDER, District Judge, and Ronald Dale Easthope, Defendants.

STATE of Utah, Plaintiff,

v.

Ronald Dale EASTHOPE, Defendant.

Bonneville International Corporation (including KSL AM & TV divisions of Bonneville International Corporation), Appellant.

Nos. 18231, 18322.

Supreme Court of Utah.

June 23, 1983.

514

During 1971, the media gave extensive coverage to a series of apparently related rapes in the Sugarhouse area of Salt Lake City. The media dubbed the unknown assailant the "Sugarhouse rapist." Late in 1971, the defendant, Ronald Dale Easthope, was arrested for some of these crimes, and in connection with his trial and conviction for two rapes the media referred to him as the "Sugarhouse rapist." After serving about ten years in prison, defendant was paroled. In September 1981, he was arrested for a rape committed in that month. Salt Lake City's *Deseret News* and *Salt Lake Tribune* and KSL Radio reported that the man known as the "Sugarhouse rapist," who had been convicted of rape in 1971, again faced similar charges. The headline, "Paroled 'Sugar House Rapist' Charged With Sexual Assault," is representative of that news coverage.

When defendant's trial began on February 3, 1982, his counsel asked the court to sequester the jury to prevent any possible prejudice from media coverage of the trial. Counsel anticipated such coverage because of the extensive publicity given the trial in 1971 and because of requests he had received for media interviews with the defendant. The motion was denied. The jury was admonished not to read, hear, or see anything in the news media regarding the case. After the victim and one other witness had testified, the judge recognized reporter Dick Allgire of KUTV in the courtroom and invited him into chambers with counsel. There, on the record, the judge advised the reporter that he intended to issue an order "that none of the news media is to use the term 'Sugarhouse rapist' during the course of the trial, because I think it is highly prejudicial." Defense counsel inquired whether the order could be extended to any comment about the defendant's earlier convictions, and the judge responded that he would extend the order "to any comments about Mr. Easthope's activities prior to the trial that would in any way show his involvement with the law." The judge explained that he was not trying "to cut the news media out," but only seeking to assure a fair trial.

George M. McMillan, Patrick A. Shea, Gifford W. Price, Mark O. Van Wagoner, Salt Lake City, for appellant and plaintiffs.

David L. Wilkinson, Atty. Gen., Theodore L. Cannon, Robert Wallace, Thomas P. Vuyk, Salt Lake City, for Conder and State.

Lynn Brown, Salt Lake City, for Easthope.

OAKS, Justice:

Media representatives seek review of a district court order barring any Utah news media from using the words "Sugarhouse rapist" or disseminating any information on the past convictions of a criminal defendant during the pendency of his trial. At issue are the cherished and sometimes conflicting values of free press and fair trial. The facts are undisputed.

The reporter used the judge's phone to advise his television station of the order. The judge then asked him, "Do you know how to get the news to the rest of the news media, as you see them, that this is going to be my order?" The reporter replied: "Well, if they aren't here, I'll tell Mike Carter of the Tribune. Don't know if anyone else is aware of the trial." The judge then declined the reporter's request to delay the proceeding until the KUTV lawyer returned his call, and the trial resumed.

Later that afternoon, a lawyer for KUTV met with the judge and counsel in chambers, off the record. The judge heard argument from counsel, explained the reasons for the order, and refused to vacate it. That evening, KUTV rewrote its evening news programs to comply with the court's order.[1] Other television and radio stations and newspapers apparently also complied with the order.

On the following day, February 4, in response to counsel's request, the court signed an order that begins by reciting concerns for the defendant's rights to a fair trial "if certain terms or past criminal records" are mentioned by the news media. The order concludes:

> The news media in and for Salt Lake County and the State of Utah are prohibited from broadcasting, publishing or otherwise conveying to the public any of the following:
>
> 1) The words "Sugarhouse rapist",
>
> 2) Any information relating to the past convictions of defendant Ronald Dale Easthope, during the pendency of the above-entitled matter before this Court.
>
> . . . .
>
> This order to be sealed and not released to the public.

Later that day, this complaint and petition for a writ of prohibition was filed in this Court. The petitioners are KUTV, Inc., Deseret News Publishing Co., KSL AM and TV divisions of Bonneville International Corporation, and the Society of Professional Journalists. Petitioners sought an order directing the judge to vacate his order, or, in the alternative, declaring that the order was contrary to law and exceeded the court's jurisdiction because it was offensive to the First and Fourteenth Amendments to the United States Constitution. Petitioners also sought a stay of the judge's order, pending hearing in this Court, or a stay of defendant's trial.

Because the requested stays were not granted, the trial went forward. The media observed the terms of the order. There was no reference in the trial to the terms "Sugarhouse rapist." On February 8, 1982, as part of his testimony at the trial, defendant admitted his two 1971 convictions of rape. Late that afternoon, the jury found defendant guilty of aggravated sexual assault. Immediately after polling the jury, the court vacated the order imposed on the news media. Thereafter, Bonneville International Corporation filed a timely notice of appeal from the order of February 4, 1982. That appeal, No. 18322, was later consolidated with the petition for a writ of prohibition, and the two cases have been briefed and argued jointly.

I.

At the outset, we treat three matters not contested but essential to our disposition of this case. We also stress an important distinction.

■ *First,* this case will not be dismissed as moot. Although the challenged order was vacated at the conclusion of the trial, the issue in this case is clearly capable of repetition, yet the legality of a short-lived order like this will evade review unless the appellate court applies an exception to the mootness doctrine. *Wickham v. Fisher,* Utah, 629 P.2d 896 (1981). Here, the underlying dispute remains, it is of considerable public interest, and it is strenuously contested by the parties before the Court. On facts similar to these, the United States Supreme Court applied an exception to mootness and reached the merits in *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), and in *Nebraska Press Assn. v. Stuart,* 427

---

1. KUTV reported that defendant was being tried for rape and that the court had entered an order prohibiting them from reporting facts about him that were already of public record.

U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). We do likewise.

■ *Second,* the parties who have challenged the order are properly before the Court. Bonneville has standing to appeal the order since it is clear from its actions that Bonneville had actual notice and is within the class of persons whose conduct the order purported to restrain. *Reihe v. District Court,* Iowa, 184 N.W.2d 701, 704–05 (1971); *Fordham University v. King,* 63 Misc.2d 611, 313 N.Y.S.2d 208, 210 (1970); *People v. Maslowsky,* 34 Ill.2d 456, 466, 216 N.E.2d 669, 675, *appeal dismissed,* 385 U.S. 11, 87 S.Ct. 94, 17 L.Ed.2d 11 (1966); 42 Am.Jur.2d *Injunctions* § 320 (1969).

■ *Third,* the extraordinary writ in the nature of prohibition sought by KUTV and others is a proper remedy for challenging orders such as this. Utah R.Civ.P. 65B(b)(2) and (4); *Van Cott v. Turner,* 88 Utah 535, 544, 56 P.2d 16, 20 (1936); *Smith v. Kimball,* 76 Utah 350, 354–55, 289 P. 588, 589 (1930); *State ex rel. Dayton Newspapers, Inc. v. Phillips,* 46 Ohio St.2d 457, 458, 351 N.E.2d 127, 129 (1976); *State ex rel. Beacon Journal Publishing Co. v. Kainrad,* 46 Ohio St.2d 349, 355, 348 N.E.2d 695, 699 (1976). *See also Philadelphia Newspapers, Inc. v. Jerome,* 478 Pa. 484, 494–95 & n. 11, 387 A.2d 425, 430 & n. 11 (1978), *appeal dismissed,* 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979). As was noted in *Beacon Journal,* there is no plain and adequate remedy at law by way of appeal. The media "is in the precarious position of having to either violate the temporary restraining order or acquiesce in the violation of the First Amendment to the Constitution of the United States. Other than the requested writ, there is no other remedy which can solve [the media's] irreconcilable conflict." 46 Ohio St.2d at 355, 348 N.E.2d at 699. Here, the media have observed the order with commendable rectitude, trusting the appellate process to vindicate the constitutional right by means of an extraordinary writ. That trust was not misplaced. The question will be resolved on the merits.

It is also well to note at the outset that this case does not involve restraints on the acquisition of information for publication. Some such restraints are constitutionally permissible. Thus, the Supreme Court has recognized that what it has called "the First Amendment right of access to criminal trials" is not absolute and can be denied where "the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Court,* 102 S.Ct. at 2619–20. *See also Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (excluding public and press from pretrial motion to suppress confessions and physical evidence); *State ex rel. Post-Tribune Publishing Co. v. Porter Superior Court,* Ind., 412 N.E.2d 748 (1980) (pretrial bail hearing closed and transcript withheld until jury sworn); *Philadelphia Newspapers, Inc. v. Jerome, supra* (pretrial motion to suppress).

Our own decisions have likewise recognized and applied the principle that the right of access to criminal trials is not absolute. *KUTV, Inc. v. Conder,* Utah, 635 P.2d 412 (1981); *In re Modification of Canon 3A(7),* Utah, 628 P.2d 1292 (1981). *Cf. Redding v. Jacobsen,* Utah, 638 P.2d 503 (1981) (governmental records). Our recent opinion on photography in the courtroom evidences our judgment that the freedom to gather news can be inhibited when a news presence, coupled with the prospect or fact of publication, poses "a substantial likelihood that such activity would jeopardize a fair hearing or trial in the matter at issue." *In re Modification of Canon 3A(7),* 628 P.2d at 1294. Thus, our rule altogether prohibits courtroom photographs of jurors "to eliminate the risk that their photographic depiction could jeopardize the fairness of their deliberations." *Id. Cf. Estes v. Texas,* 381 U.S. 532, 545–47, 85 S.Ct. 1628, 1634–35, 14 L.Ed.2d 543 (1965) (potential prejudicial impact of televising jurors).

In contrast, in this case the media had full access to the defendant's trial and to the official records concerning him, and there is no question of impropriety in their gathering or possessing the information they wish to publish.

## II.

This case involves the legality of an ex parte order that prohibited print and electronic media, for the duration of a criminal trial, from publishing facts of public record and from using two words they had previously used in describing the defendant. In short, this case poses the bare question of whether a court can impose a short-term prior restraint on publication in the interest of assuring a defendant his constitutional right to a trial by an impartial jury free of outside influences. U.S. Const. amend. VI; Utah Const. art. I, § 12; *Duncan v. Louisiana,* 391 U.S. 145, 148–49, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968).

■ There can be no doubt that pretrial or during-trial publicity that comes to the attention of prospective or sitting jurors can deprive a criminal defendant of a fair trial. Appellate courts have been obliged to reverse convictions on this ground where the publicity was pervasive and prejudicial. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Among the Utah cases discussing the effects of allegedly prejudicial publicity are *Codianna v. Morris,* Utah, 660 P.2d 1101 (1983); *State v. Wood,* Utah, 648 P.2d 71, 88–89, *cert. denied,* —— U.S. ——, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v. Pierre,* Utah, 572 P.2d 1338, 1348–50 (1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); and *Sinclair v. Turner,* 20 Utah 2d 126, 434 P.2d 305 (1967). Thus far, we have never reversed a conviction on this ground.

■ In this case, the district judge had the duty of protecting the defendant from potentially prejudicial publicity. The judge's order, entered in the stress of trial and without the instruction of precedent in comparable circumstances, was the understandable product of his sensitivity to the defendant's due process right to a fair trial before an impartial jury and his honorable efforts to avoid even the possibility of taint.

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the *probability* of unfairness.... [T]o perform its high function in the best way "justice must satisfy the appearance of justice."

*Estes v. Texas,* 381 U.S. 532, 543, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543 (1965), quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (emphasis in original).

From the standpoint of the freedom of the press, two constitutional provisions govern this issue. The First Amendment to the United States Constitution provides: "Congress shall make no law ... abridging the freedom of speech, or of the press ...." This guarantee is well used and robust. Article I, § 15 of the Utah Constitution provides: "No law shall be passed to abridge or restrain the freedom of speech or of the press." This provision has never been authoritatively interpreted.

The history of Article I, § 15 of the Utah Constitution is sparse. While this provision was discussed at some length before the Constitutional Convention, sitting as a committee of the whole to hear the report of the Committee on Preamble and Declaration of Rights, the discussion exclusively concerned the second sentence, dealing with truth as a defense to an alleged libel. The current text of the first sentence, dealing with the freedom of the press, apparently came into the Utah Constitution on the recommendation of the committee, without reported discussion. Delegate Heber M. Wells, speaking for the committee, did inform the convention that "this section [15], just as it stands here, is the same as in New York, California, Michigan, Wisconsin, South Carolina, and Maine, and there are similar provisions in a great many of the states." 1 *Official Report of the Proceedings and Debates of the Convention* 322 (1898). While our research suggests that this listing of states with "similar provi-

sions" was not entirely accurate,[2] it is clear that there were identical or substantially similar provisions in other states whose judicial decisions—especially prior to our 1895 Constitutional Convention—could provide guidance on the intended meaning of the language employed in Utah.

Court decisions in California, one of the states named by Delegate Wells, are particularly helpful on the then-current understanding of the meaning of the freedom of the press and its relationship to the court's use of the power of contempt to assure a fair trial and the appropriate administration of justice. In *Ex parte Barry,* 85 Cal. 603, 25 P. 256 (1890), the Supreme Court affirmed a judgment of contempt against a newspaper publisher for a libelous article about a judge in a pending case. The Court termed the article an unlawful interference with the proceedings of the court and "a most flagrant abuse of the liberty of the press." *Id.* at 608, 25 P. at 258. *Accord, Matter of Impeachment,* 1 Cal. 545 (1851) (legislative body refused to impeach judge for holding newspaperman in contempt for article libeling judge concerning his charge to grand jury in a pending case).

Of even greater interest is the California court's reaction to a prior restraint. During a divorce case, the trial court had ordered that "no public report or publication of any character of the testimony in the case be made." *In re Shortridge,* 99 Cal. 526, 528, 34 P. 227, 228 (1893). Thereafter, a newspaper published an article containing the testimony of trial witnesses. The paper was held in contempt. Relying on California's constitutional provision forbidding any law "to restrain or abridge the liberty of speech or of the press," the California Supreme Court annulled the judgment of contempt. The Court's opinion contains a ringing denunciation of prior restraints, but it carefully leaves open the possibility that even this most significant interference with the freedom of the press might be sustained if necessary to the orderly and fair conduct of a trial. The following portions of the opinion reveal the court's reasoning:

The rights thus preserved by the constitution are dear to the heart of every American, and their exercise can be complained of by the courts in a summary proceeding only when the publication or the speech interferes with the proper performance of judicial duty. If there has been no such interference, there has been no contempt. *In the article complained of we find nothing which could have interfered with a full and fair investigation of the merits of the case then on trial.* The case was before the court without a jury. It is not claimed that the petitioner, in his report, mutilated the testimony, misrepresented or reflected upon the judge, attempted to intimidate or swerve any witness, or to dictate to any one connected with the trial what his action should be in regard to any matter. How, then, could such an article interrupt the orderly conduct of a trial, or tend to induce a failure of justice? . . . We are aware of the fact that there are English precedents for holding that the courts possess and exercise the power to prohibit in all cases the publication of their proceedings; but we know of no decision in this country upholding the right of a court to make such prohibition, except where the publication tended to interfere with the proceedings before the court. . . . Liberty of the press must not be confounded with mere license. Liberty of. the press stops where a further exercise would invade the rights of others. *This provision of the constitution does not authorize a usurpation of the functions of the courts.* Under the plea of the liberty of the press, a newspaper has no right to assail litigants during the progress of a trial, intimidate witnesses, dictate verdicts or judgments, or spread before juries its opinion of the merits of cases which are on trial. As stated before, what may be spoken may be written; and the converse of the proposition is true, that what may not be spoken

---

2. The contemporary provisions in the constitutions of Maine and South Carolina appear to be

very dissimilar to Utah's.

under such circumstances may not be written. As the article in question does not go beyond these limitations, and as the section under which the court below proceeded to judgment clearly does not authorize the order which was made, the proceedings must be annulled. [Emphasis added.]

*Id.* at 533–35, 34 P. at 230–31.

New York, another state cited in the Convention discussion of Article I, § 15, had some early decisions sustaining the court's contempt power to punish the authors or publishers of newspaper articles that might affect the integrity of pending judicial proceedings, but these cases, like others in this period, did not discuss the effect of the state constitutional provision guaranteeing the freedom of the press.[3]

Iowa, which has a constitutional provision nearly identical to Utah's, has more case law on the question of free press versus fair trial in this period than any other state we have found. In the earliest of these cases, *Dunham v. State,* 6 Iowa 245 (1858), the court relied on the law of contempt, construed in light of the state constitutional provision on free press, to reverse a judgment of contempt against a newspaper editor for articles critical of the judge's decisions in cases that had been concluded. In doing so, however, the Court distinguished *pending* cases, observing that the willful disobedience of an order restraining publication of testimony in a pending case might be contemptuous. "Such rules are not unfrequently made," the court observed, "and are often calculated to prevent improper impressions being made upon jurors, to the injury of the parties litigating." *Id.* at 256.

The wider scope of commentary permitted with respect to cases that had concluded and the possibility that criticism of the court during the course of proceedings could be contemptuous were reaffirmed in *State v. Anderson,* 40 Iowa 207 (1875). Then, in *Field v. Thornell,* 106 Iowa 7, 75 N.W. 685 (1898), the Iowa court used this distinction to affirm a judgment of contempt against a newspaper editor who had published critical commentary on a pending case and handed the newspaper to two jurors during an adjournment. After approving the appropriateness of the remedy of contempt as a means to assure a litigant "a fair and impartial trial," *id.* at 11, 75 N.W. at 687, the court gave this comment on the significance of the fact that this interference had come from a newspaper:

*Newspapers cannot be permitted to invade the sanctity of the courts of justice,* assail litigants, intimidate witnesses, and dictate the verdicts of jurors or the judgments of the court. *The trial of De Ford was pending when the article in question was published.* The petitioner had every reason to believe it would fall into the hands of the witnesses and jurors. Its natural tendency was to intimidate the witnesses in attendance of court, and to influence the jury in reaching their verdict. The judgment imposed was fully warranted by the evidence and the law. *State v. Judge of Civil Dist. Ct.* (La.) [45 La.Ann. 1250] 14 South. 310. It must be added, however, that the courts have no power or desire to control the press in its legitimate sphere. Its freedom is jealously guarded by the law, and made secure in the constitution. It enjoys the utmost latitude in reviewing the action of the courts, and may, *after the particular litigation is ended,* assail, with just criticism, opinions, rulings, and judgments with the weapons of reason, ridicule, or sarcasm. . . . It is seldom, however, that an honorable journalist so far forgets his self-respect as to trespass upon the rights of the judiciary, or seek to control or improperly influence its conclusions. Courts are constantly passing on questions affecting the life and liberty of the citizen, as well as the rights of property; and the freedom of the judiciary to investigate and decide is quite as important to the well-being of society as the freedom

---

**3.** *People v. Few,* N.Y.Sup.Ct., 2 Johns. 290 (1807); *People v. Freer,* N.Y.Sup.Ct., 1 Cai.R. 518 (1804).

of the press. Let the courts perform their duties unmolested, but their final judgments, as well as the manner of reaching them, are *thereafter* open to the world for such criticism or condemnation as taste or necessity may require. [Emphasis added.]

*Id.* 106 Iowa at 15–16, 75 N.W. at 688.

A review of reported decisions in states with constitutional provisions different from Utah's reveals a similar approach. Although most of these opinions demonstrate an awareness of the constitutional guarantee of a free press, that guarantee is not seen as barring the court from exercising its contempt powers to fine or imprison a newspaper author, editor, or publisher for articles that are seen as impeding, embarrassing, or obstructing the administration of justice in pending cases.[4]

■ This review of state case law in the period prior to and contemporaneous with the adoption of Utah's Constitution provides no support for the argument that the delegates and voters who framed and adopted Article I, § 15 intended to create an absolute right that would exalt the freedom of the press over every other freedom

and interest protected in the Constitution. On the other hand, we think it can be said that a provision such as Article I, § 15, adopted in 1895 against the background of over a century of experience under the United States Constitution and prohibiting laws that would "restrain" as well as "abridge" the freedom of the press, is at least as protective of these rights as the First Amendment. That is as far as we need to go for the decision of this case.

In his great opinion for the Court in *Near v. Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931), written in the context of a publication critical of government officials, Chief Justice Hughes declared that the freedom of the press "has meant, principally although not exclusively, immunity from previous restraints or censorship." While conceding that "the protection even as to previous restraint is not absolutely unlimited" his opinion points out that "the limitation has been recognized only in exceptional cases." Subsequent judicial treatment of this subject, including the exceptions noted in the *Near* opinion,[5] leaves no doubt that in respect to the publi-

---

**4.** Cases sustaining the appropriateness of a judgment of contempt in respect to a pending case, despite the freedom of the press, include: *State v. Morrill,* 16 Ark. 384 (1855); *Cooper v. People,* 13 Colo. 337, 22 P. 790 (1889); *People v. Wilson,* 64 Ill. 195 (1872); *State v. Judge of Civil District Court,* 45 La.Ann. 1250, 14 So. 310 (1893); *In re Sturoc,* 48 N.H. 428 (1869); *State v. Frew,* 24 W.Va. 416 (1884). In contrast, another case held that commentary that might have been contemptuous if the case were pending cannot be punished as such if published after the case has been concluded because it no longer has a tendency to hinder or obstruct the judicial process and because the freedom of the press applies to such publications. *Storey v. People,* 79 Ill. 45 (1875).

Cases approving the appropriateness of a judgment of contempt in a pending case, without discussing the freedom of the press, include: *Myers v. State,* 46 Ohio St. 473, 22 N.E. 43 (1889); *Respublica v. Oswald,* 1 Dall. 318 [319] (Pa.1788); *Respublica v. Passmore,* 3 Yeates 440 [441] (Pa.1802); *State v. Galloway,* 5 Cold. 326, 98 Am.Dec. 404 (Tenn.1868). In contrast, contempt was held inappropriate where the comments concerned a case that had been concluded. *State v. Kaiser,* 20 Or. 50, 23 P. 964 (1890).

None of the cases in this footnote involved a prior restraint. In sustaining the contempt power, some relied on the necessity to maintain public confidence in the integrity of the judiciary, and others relied on the court's duty to assure a fair and impartial trial in the pending case.

**5.** The Court cited three exceptional circumstances: (1) to "prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops" when a nation is at war, (2) to protect community life "against incitements to acts of violence and the overthrow by force of orderly government," and (3) to enforce "the primary requirements of decency ... against obscene publications." 283 U.S. at 716, 51 S.Ct. at 631. All three of these exceptions have been overshadowed by subsequent cases. *See also United States v. Progressive, Inc.,* 467 F.Supp. 990 (W.D.Wis.), *appeal dismissed,* 610 F.2d 819 (7th Cir.1979) (granting preliminary injunction against publication of technical material on hydrogen bomb design; government abandoned proceedings before appellate review obtained).

cation of news and opinion the exceptions are narrowly drawn in theory and rarely applied in practice. Hence, as subsequent cases have held, any prior restraint on expression bears "a heavy presumption against its constitutional validity," and the government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971).

The conflict between the rights of free press and fair trial is very real. In a half dozen reported cases, a trial judge has imposed a prior restraint to assure a defendant a fair trial. Most of these cases, including *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and *Arkansas Gazette Co. v. Lofton,* 269 Ark. 109, 598 S.W.2d 745 (1980), relied upon by the parties and discussed hereafter, involved orders prohibiting *pretrial* publicity.[6] All were reversed on appeal. In contrast, this case involves an order prohibiting *during-trial* publicity. Our research has disclosed only two other cases of this nature, *New York Times Co. v. Starkey,* 51 A.D.2d 60, 380 N.Y.S.2d 239 (1976), and *State ex rel. Miami Herald Publishing Co.*

*v. McIntosh,* Fla., 340 So.2d 904 (1976). In both of these cases, appellate courts set aside trial orders limiting newspapers to publishing matters which transpired in the courtroom.[7]

The difficulty of resolving free-press and fair-trial conflicts in an adversary context has resulted in cooperative efforts to prescribe voluntary guidelines. The American Bar Association's tentative draft of *Standards Relating to Fair Trial and Free Press* (1966) canvasses three possible corrective measures: (1) restrictions on the news media, (2) expansion of remedies for a defendant who complains of prejudicial news coverage, and (3) restrictions on the release of information for limited periods by participants in the criminal justice process. The ABA draft makes no recommendation of "direct restrictions on the news media" because this would involve constitutional questions and inhibitions in public information and discussion that are not warranted "in the absence of the clearest showing that less drastic measures will not achieve the objective." *Id.* at 69–70. The standards finally adopted rely primarily on restrictions on the release of information. American Bar Association, *Standards Relating to Fair Trial and Free Press* 1–14 (1968). However, the ABA does approve use of the contempt power to punish a person (1) who

**6.** *United States v. Dickinson,* 465 F.2d 496 (5th Cir.1972), (rev'g trial court order restraining any publication of evidence in pretrial hearing), aff'd, 476 F.2d 373 (5th Cir.1973), *cert. denied,* 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223 (1973). *Cf. Keene Publishing Corp. v. Cheshire County Superior Court,* 119 N.H. 710, 406 A.2d 137 (1979) (rev'g as implied "gag order" trial court's order requiring publisher's counsel to advise him what information obtained in pretrial suppression hearing would be published); *Cooper v. Rockford Newspapers, Inc.,* 34 Ill. App.3d 645, 339 N.E.2d 477 (1975) (rev'g trial court's order restraining newspaper from "writing editorials or editorializing" about libel suit in which it was defendant); *CBS Inc. v. Young,* 522 F.2d 234 (6th Cir.1975) (rev'g pretrial order to parties, counsel, court personnel, and all others "concerned with [the] litigation" not to discuss with media or the public pending suit for damages growing out of Kent State shootings); *Am. Broadcasting Companies v. Smith Cabinet Mfg. Co.,* 160 Ind.App. 367, 312 N.E.2d 85 (1974) (rev'g injunction against

broadcast of allegedly libelous documentary on flammable baby crib).

**7.** *See also Wood v. Goodson,* 253 Ark. 196, 485 S.W.2d 213 (1972) (rev'g trial court's order prohibiting publication of jury verdict for period of about twelve hours until companion jury, trying defendant's two codefendants for same crime, could finish hearing evidence and commence its deliberations); *Des Moines Register & Tribune v. Osmundson,* Iowa, 248 N.W.2d 493 (1976) (rev'g trial court's order prohibiting anyone from disclosing likenesses or identities, names, addresses, or phone numbers of jurors during trial). *Cf. Oliver v. Postel,* 30 N.Y.2d 171, 331 N.Y.S.2d 407, 282 N.E.2d 306 (1972) (rev'g trial court's order closing courtroom to press and public for balance of trial where, during first days of trial, press published prejudicial material about defendant notwithstanding trial judge's repeated warnings not to publish anything other than what transpired at trial).

disseminates prejudicial information that goes beyond the public record in the case, that is willfully designed to affect the outcome of the trial, and that seriously threatens to have that effect, or (2) who knowingly violates a valid judicial order not to disseminate, until completion of the trial, specified information referred to in the course of a judicial hearing closed to protect the defendant's rights to a fair trial by an impartial jury. *Id.* at 13–14.

In June 1981, a special committee of the Utah State Bar, in cooperation with various media organizations (including all of the parties to these cases) promulgated, published, and distributed "Principles and Guidelines for News Reporting." This publication is stated to be "a reasonable means of accommodating, on a voluntary basis, the correlative constitutional rights of free speech and free press with the right of an accused to a fair trial." [8] *Id.* at 1. The following provision is directly relevant to the controversy in this case:

> Prior criminal charges and convictions are, in some areas, a matter of public record and in some instances may be available to the news media through police agencies or from court records. Such information is inadmissible on the question of guilt and pretrial publication may jeopardize a defendant's right to a fair trial and therefore, should be avoided.

*Id.* at 4.

Neither the ABA *Standards* nor the Utah State Bar's "Principles and Guidelines" resolves the problems before us in this case. However, it is instructive and perhaps ironic that the *Standards* does not approve the kind of prior restraint issued in this case, but, on the other hand, the restraining order would have been unnecessary if the court could have been sure that the media would observe the voluntary "Principles and Guidelines" they had participated in drafting.

### III.

■■■ Voluntary methods are obviously preferable for the solution of head-on constitutional conflicts such as these, but when individual controversies prove intractable to voluntary solutions, the courts must resolve them. The media are strong spokesmen for the values of free press, and the public interest in a fair trial for the defendant is represented by counsel for defense and prosecution. As the ultimate custodian of constitutional values, the judicial branch of government has no favorites in this contest, but must define a balance that will preserve and credit both free press and fair trial to the maximum extent possible. The courts must also devise procedures by which such controversies can be resolved and, hopefully, kept to a minimum.

The closest precedent on its facts is *Nebraska Press Assn. v. Stuart, supra.*[9] In order to avoid the likelihood of prejudicial news coverage that would make it difficult to select an impartial jury, the trial judge prohibited the press from publishing certain facts about a murder case until after the jury was impaneled. The Nebraska Supreme Court approved the order insofar as it prohibited publishing the substance of any confessions or other evidence "strongly implicative" of the defendant.

The United States Supreme Court held the restraining order violative of the constitutional guarantees of a free press. First, the order was "clearly invalid" insofar as it prohibited the publication of evidence adduced at the preliminary hearing because "once a public hearing had been held, what transpired there could not be subject to a prior restraint." 427 U.S. at 568, 570, 96 S.Ct. at 2807, 2808.[10] Second, and more

**8.** The "Principles and Guidelines" states that it does "not necessarily reflect in all respects what the members of the ... news media believe would be permitted or required by law." Principles and Guidelines for News Reporting 1 (1981).

**9.** The *Nebraska Press Assn.* case is praised, damned, and dissected by nineteen authors of varying points of view in an illuminating symposium in 29 Stan.L.Rev. 383–626 (1977).

**10.** The Court had previously held that a state could not constitutionally impose a sanction upon "the publication of truthful information

important, insofar as the order prohibited publication of information gained from sources other than the public preliminary hearing, it was invalid because it was issued without a sufficient showing to satisfy "the heavy burden imposed as a condition to securing a prior restraint." *Id.* at 570, 96 S.Ct. at 2808. Four justices took the position (three absolutely and one qualifiedly) that a prior restraint would never be justified, *id.* at 572, 617, 96 S.Ct. at 2809, 2830, but the majority concluded that the Court "need not rule out the possibility of showing the kind of threat to fair trial rights that would possess the requisite degree of certainty to justify restraint." *Id.* at 569–70, 96 S.Ct. at 2808.

The majority reversed the restraint in *Nebraska Press* because the facts did not meet a three-part test involving (1) the extent to which the probable publicity threatened the fairness of the forthcoming trial, (2) "whether measures short of an order restraining all publication would have insured the defendant a fair trial," *id.* at 563, 96 S.Ct. at 2804–05, and (3) whether the restraint would, in fact, have achieved the desired protection. Most of those considerations are not applicable to the issue before us. A pretrial order like that in *Nebraska Press* seeks to avoid difficulty in selecting an impartial jury. A during-trial order, such as the one before us, seeks to shield a jury (assumed to be impartial) from the kind of outside information that could deprive the defendant of a fair trial or require a mistrial.

Although *Nebraska Press* is distinguishable on its facts, it is persuasive of the appropriate method for resolving a controversy involving a contest between free press and fair trial. Consistent with the majority's approach in that case, we assume, without deciding, that there may be circumstances where a prior restraint of some sort would be justified in order to assure a defendant a fair trial, but hold the order entered in this case invalid because it was not accompanied by the procedural formalities and evidentiary showings necessary to justify such a restraint, assuming it could ever be justified.

■ First, we treat procedure. We believe that a prior restraint entered without notice and hearing involving the media would always be invalid.[11] This follows from the requirements of due process of law, U.S. Const. amend. V, XIV; Utah Const. art. I, § 7, applied to the liberty interest protected by the federal and state prohibitions against laws abridging or (in the case of the state) restraining the freedom of the press. U.S. Const. amend. I, Utah Const. art. I, § 15. So far as it concerns the federal Constitution, this was the basis for the holding in *State ex rel. Miami Herald Publishing Co. v. McIntosh,* 340 So.2d at 910, and the alternate basis for the holding in *New York Times Co. v. Starkey,* 380 N.Y.S.2d at 244, and we follow those cases on this point. Our state Constitution requires no less.

■ The nature and extent of the media notice and hearing required by our ruling would be dictated by the circumstances, but should at least assure the kind of vigorous opposition that will explore the necessity for and alternatives to the proposed restraint and permit the court to make its ruling in the context of a truly adversary proceeding. The hearing should also be a matter of record and be concluded by written findings of fact and conclusions of law to facilitate appellate review.

■ Here, neither notice nor hearing met the constitutional standard. The order

contained in official court records open to public inspection." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 496, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975). *See also Oklahoma Publishing Co. v. District Court,* 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977). *Cf. State v. Stauffer Communications, Inc.,* 225 Kan. 540, 592 P.2d 891 (1979) (statute may not impose criminal sanctions against news media for publishing truthful information about issuance of arrest warrants prior to execution and return where information properly obtained from public records).

11. This statement is not meant to imply that a court could not issue a valid temporary restraining order to prohibit publication for a very short time where necessary to preserve the issue for speedy judicial review.

was entered without notice to the affected media or their counsel. The trial judge's subsequent in-chambers conference with counsel for KUTV did not satisfy the hearing requirement in a matter as grave as this.

In *Globe Newspaper Co. v. Superior Court, supra,* the Supreme Court reasoned that a case-by-case consideration of the interests of a minor victim of crime (rather than an outright statutory prohibition on publishing victims' identities) was constitutionally required to ensure "that the constitutional right of the press and public to gain access to criminal trials will not be restricted except where necessary to protect the State's interest." 102 S.Ct. at 2621–22. That case dealt with a question of the press's right of access to information, but we believe that the requirement of an individual adversary hearing will serve the same protective purpose and is even more important when the issue is a proposed restraint on publication.

■ In such a hearing, the trial court can explore whether there is any significant prospect that the media will publish potentially prejudicial material. In this case, it is far from clear that a far-ranging prior restraint was needed, even if one was constitutionally permissible in the circumstances. A hearing where principal media were represented could have clarified the risk of prejudicial publicity that could come to the attention of the jury, and perhaps could have resulted in assurances that would have obviated the necessity for legal resolution of the conflict between free press and fair trial. At a minimum, a hearing would increase the likelihood that any restraint would be drawn to encompass no more than the bare minimum necessary to assure fairness for the defendant on trial.

■ In terms of content, the prior restraint imposed in this case was also partially invalid for two other reasons. First, whatever the original validity of the order forbidding publication of the fact of defendant's past convictions, as to that subject the order became "clearly invalid" as soon as the defendant admitted those convictions in his testimony in open court. *Nebraska Press Assn.,* discussed in text accompanying note 10 *supra.*

■ Second, the order prohibiting any media in the state of Utah from using the words "Sugarhouse rapist" cannot stand by itself. Though sensational and unsavory, that epithet is still an instrument used to communicate information or ideas. If prior restraint cannot be used to withhold information and ideas, neither can it be used to censor the vocabulary through which they are communicated. This is what we understand to have been the basis for the holding that a trial judge could not forbid the media from referring to an accused as the "Quapaw Quarter rapist" in any news stories published prior to the impaneling of the jury. *Arkansas Gazette Co. v. Lofton,* 269 Ark. 109, 598 S.W.2d 745 (1980). We agree with that reasoning and hold it at least equally applicable to restrictions imposed during the course of the trial. Whether such a reference could be prohibited as part of a ban on publishing information on a defendant's prior convictions depends on the validity of a prior restraint on that information, adjudicated upon proper notice and hearing. On that subject, we express no opinion for the reasons discussed below.

### IV.

■ The *Nebraska Press Assn.* opinion suggests a three-part test to guide trial courts in determining whether a prior restraint on pretrial publication is justified in an individual case, assuming it can ever be justified. We decline to offer a test of comparable particularity in respect to during-trial restraints. In a case that is technically moot, we have already gone as far into the realm of an advisory opinion as we think the necessary exception to mootness can carry us.

■ The controversy over the specific facts of this case was concluded when the order was vacated. Our reversal of that order will not be followed by a remand. In fact, we have no evidence that any media other than KUTV were even considering publishing

the fact of defendant's earlier convictions prior to the time he admitted them at the trial. The inference is to the contrary, in view of the voluntary "Principles and Guidelines" to which the media had subscribed. Even as to KUTV, the evidence of what would have been published is equivocal.[12] There is no evidence of irresponsible media action or intentions in the record of this case nor, so far as we are aware, in the recent history of this state. The absence of a real controversy on a specific set of facts makes it particularly inappropriate for us to undertake to draw a constitutional line between the sometimes adversary interests of free press and fair trial. Such a line would be more likely to create disputes than to settle them. Consequently, articulation of a particular test will have to await another controversy where specific facts and thorough briefing will aid us in a task of exquisite complexity and importance.

## V.

Concern for the dilemma of the trial judge prompts us to add a brief survey of some of the competing interests at work in this area. Although the general observations in this concluding part may suggest legal arguments and areas for the development of facts, they do not represent any qualification of our determination not to offer a specific test at this time.

In its opinion in *Nebraska Press Assn.,* the United States Supreme Court discussed *Near v. Minnesota, supra,* and subsequent cases involving attempted restraints on communication of ideas and concluded:

> The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. . . .
>
> A prior restraint, by contrast [to a criminal penalty or a judgment in a defamation case] and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time.
>
> The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events.

427 U.S. at 559, 96 S.Ct. at 2803. The Court concluded that same paragraph with this countervailing caution:

> The extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly—a duty widely acknowledged but not always observed by editors and publishers. It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused to a fair trial by unbiased jurors.

*Id.* at 560,[13] 96 S.Ct. at 2803.

The foregoing caution is particularly appropriate in view of the fact that the most

---

**12.** *See supra* note 1 and accompanying text.

**13.** Concurring in *Pennekamp v. Florida,* 328 U.S. 331, 365–66, 66 S.Ct. 1029, 1046–47, 90 L.Ed. 1295 (1946), Justice Frankfurter gave this expression of the same caution:

> The press does have the right, which is its professional function, to criticize and to advocate. The whole gamut of public affairs is the domain for fearless and critical comment, and not least the administration of justice. But the public function which belongs to the press makes it an obligation of honor to exercise this function only with the fullest sense of responsibility. Without such a lively sense of responsibility a free press may readily become a powerful instrument of injustice. It should not and may not attempt to influ-

ence judges or juries before they have made up their minds on pending controversies. Such a restriction, which merely bars the operation of extraneous influence specifically directed to a concrete case, in no wise curtails the fullest discussion of public issues generally. It is not suggested that generalized discussion of a particular topic should be forbidden, or run the hazard of contempt proceedings, merely because some phases of such a general topic may be involved in a pending litigation. It is the focused attempt to influence a particular decision that may have a corroding effect on the process of justice, and it is such comment that justifies the corrective process. [Footnote omitted.]

prominent representatives of the media in this state—including the parties to this case—have admitted in the voluntary "Principles and Guidelines" that publication of information on a defendant's prior convictions may jeopardize his right to a fair trial and therefore "should be avoided." If the media were to follow their highest instincts and measure up to the "fiduciary duty" described in *Nebraska Press,* the issue of prior restraint controverted here would never arise. An ideal outcome would deny the prior restraint in any circumstances in justified reliance on the responsibility of all of the media to embargo prejudicial information until the jury has given its verdict.

If all of the media whose communications were likely to come to the attention of the jury were willing to cooperate, the required hearing could serve as an occasion to clarify the application of the voluntary guidelines to the facts of a particular case, assure fairness for the defendant on trial, and prevent any news media from obtaining competitive advantage by deviations from the voluntary restraint. Such an effort may be unrealistic in areas extensively served by media outside the court's jurisdiction, but we are not yet persuaded that it is impractical for the conditions and with the media in this state. If some media refuse to participate in such an effort, the question of restraint will not have been resolved, but it will at least have been narrowed.

Of the various remedies and preventive techniques the ABA *Standards* suggests as means to protect a defendant from prejudicial publicity, the following seem relevant to during-trial publicity:

Waiver of jury trial.

Sequestration of jury.

Admonition to jury to avoid news reports relating to the case during the course of trial.

Cautioning the media to use self-restraint in the publication of certain matters.

Examination of individual jurors with respect to possible exposure to prejudicial information during the course of trial. Ordering mistrial on the basis of such exposure.

Reversing conviction for trial court's failure to take one or more of above steps when circumstances require.

American Bar Association, *Standards Relating to Fair Trial and Free Press* 73–74 (Tent. Draft 1966). Some of these, like waiver of jury trial, exact an impermissible price of the defendant. Others depend on the voluntary cooperation of the media. In terms of effective, enforceable, compulsory measures (other than mistrial or reversal of conviction), the ABA list boils down to sequestration of the jury, which our law permits in the discretion of the court. U.C.A., 1953, § 77–17–9.

The media argue that because sequestration of the jury is always available, a prior restraint is never justified to assure a fair trial. Similarly, in *New York Times Co. v. Starkey, supra,* the court held that a prior restraint could never be justified unless all other measures within the power of the court to insure a fair trial, "such as by sequestering the jury," had been found on substantial grounds to be "unavailing or deficient." 380 N.Y.S.2d at 243. To the defendant, however, sequestration is no panacea. Its disruption, personal inconvenience, and implication of high public interest can annoy or raise suspicions in the jury to the point that the "remedy" of sequestration may result in more prejudice to the defendant than the feared publicity. *Sacramento Bee v. United States District Court,* 656 F.2d 477 (9th Cir.1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982); *United States v. Boffa,* 513 F.Supp. 444, 492–93 (D.Del.1980). Sequestration is also very costly to the public in the expense of housing, lodging, and guarding jurors. *See, e.g., State v. Allen,* 73 N.J. 132, 141–42 & n. 2, 373 A.2d 377, 381 & n. 2 (1977).[14]

**14.** We have no information on the cost of sequestering a jury in Utah since our State Court Administrator informs us that in the decade of his tenure, no district or circuit court has ever ordered sequestration.

Viewed in terms of sequestration of the jury, the issue of free press versus fair trial comes down to a decision about who will bear the cost of assuring the defendant a fair trial: sequester the jury and impose the cost on the public treasury and on the jurors (with possible prejudice to the defendant) or approve a limited prior restraint and impose the cost on the media. In the latter case, there is an economic cost to a profit-making newspaper or broadcaster, which must suffer some disadvantage in the conduct of its business by postponing the publication of some portion of the news until the trial is concluded. But economic cost is not the interest protected by our Constitutions. *Cf. Minneapolis Star & Tribune v. Minnesota Commissioner of Revenue,* —— U.S. ——, 103 S.Ct. 1365, 1369–70, 75 L.Ed.2d 295 (1983). The interest protected by the freedom of the press is the public interest in receiving information and opinion unhampered by government control. The costs that must be balanced against the costs of sequestering the jury are the costs of impairing the public's immediate access to information and opinion on public issues.

So viewed, a decision requiring the media to bear the burden of assuring a fair trial (by approving a prior restraint) might seem to impose only a small cost in an individual case. But such a decision could also be seen as a precedent posing an alarming threat to the freedom of the press. *Near v. Minnesota* suggests that the press's freedom from prior restraint might be qualified where the countervailing interest is national survival or imminent loss of life, but qualifications based on interests less ultimate than these—especially when they would inhibit reports or comments on government action—would constitute a dangerous precedent to the freedom of the press. Perhaps this was why a near-unanimous United States Supreme Court, in a case reversing a judgment of contempt against a newspaper for criticizing a judge, indicated that in "borderline" cases involving a contest between free press and fair trial, doubts should be resolved in favor of "the freedom of public comment":

[T]here are areas of discussion which an understanding writer will appraise in the light of the effect on himself and on the public of creating a clear and present danger to fair and orderly judicial administration. Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. *In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases.* Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice. [Emphasis added.]

*Pennekamp v. Florida,* 328 U.S. 331, 346–47, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295 (1946).

For the reasons stated in Part III of this opinion, the district court's order of February 4, 1982, is reversed.

HALL, C.J., and HOWE and DURHAM, JJ., concur.

STEWART, J., concurs in the result.