KUTV, INC.; Deseret News Publishing Company; KSL–TV, a division of Bonneville International Corporation; Kearns-Tribune Corporation; and Society of Professional Journalists, Sigma Delta Chi, Utah Chapter, United Press International, and Associated Press, Plaintiffs,

v.

Honorable Homer F. WILKINSON, District Judge, Defendant.

No. 19535.

Supreme Court of Utah.

May 1, 1984.

Dissenting Opinion Aug. 30, 1984.

Alan L. Sullivan, Randy L. Dryer, John Mullen, Salt Lake City, for plaintiffs.

David L. Wilkinson, Atty. Gen., Salt Lake City, for defendant.

HALL, Chief Justice.

Plaintiffs challenge the order of the district court prohibiting the news media from reporting Charles Jerome Gatto's alleged association with organized crime for the duration of his criminal trial and seek an extraordinary writ from this Court.

The issue presented for our review has become moot since the district court vacated the challenged order following the declaration of a mistrial occasioned by the exposure of jury members to extra-trial information. Nevertheless, the underlying conflict between fair trial and free press remains. Therefore, it is in the public interest that we apply an exception to mootness and reach the merits of the case.[1]

In their haste to have this matter heard on October 20, 1983, neither party provided the Court with the record or a transcript of the proceedings below. In fact, the trial court had not yet filed its written findings of fact, conclusions of law and order. Nevertheless, since the material facts were not in dispute, the Court permitted the parties to fully present their respective arguments. The Court then took the matter under advisement, with the admonition to counsel to promptly furnish the exhibits received in evidence and the written findings, conclusions and order of the trial court. Those documents were duly filed with this Court on October 21. The Court,

persuaded that the protection of Gatto's right to a fair trial justified the restraint placed upon the news media, by minute entry, denied plaintiffs' demand for relief. In so doing, this Court modified the order of the trial court to the extent necessary to restrain the dissemination of information concerning Gatto's *indirect* as well as direct association or connection with the Mafia or organized crime.[2]

The pertinent facts furnished by counsel and later by the official record are summarized as follows:

On October 17, 1983, the trial court began the jury selection process in the criminal action entitled *State of Utah v. Charles Jerome Gatto* (No. CR–82–1069, then pending in the Third District Court of Salt Lake County). Gatto was charged with four counts of felony theft involving investments by ten Utahns in an allegedly bogus gold mine. The presence in the courtroom of a number of members of the news media, representing KUTV, Inc., KSL TV and United Press International among others, prompted the court to discuss with media representatives the effect of anticipated publicity during the trial on the defendant's right to a fair trial. Alternatives to an order of the court restraining the dissemination of certain information were discussed. At that time, there was some assurance, subject to confirmation, that the media might well adopt a position of voluntary restraint. However, no such confirmation was forthcoming, and the court was later informed that there could be no guarantee that the media would exercise voluntary restraint in its publications or broadcasts. At that time, counsel for the defense moved the trial court to sequester the jury. The motion was denied.

---

1. *KUTV, Inc. v. Conder*, Utah, 668 P.2d 513 (1983).

2. The minute entry, dated October 21, 1983, reads as follows:

The Court is persuaded by the findings of the district court that protection of the defendant's right to a fair trial justified the narrowly drawn order issued after notice and hearing in this case. In order to accomplish its purpose, the order is modified to include

"... any information concerning the Defendant's direct *or indirect* connection and/or association with the Mafia and/or organized crime ...."

The relief requested in the Complaint and Petition for an Extraordinary Writ is denied.

This Court's stay of further proceedings in the criminal action is vacated.

Stewart, J., dissents. Opinions to follow.

The jury was impaneled, and the trial began during the afternoon of October 17. At the end of the day, the court gave the usual admonition to the jury members to insulate themselves from media reports concerning the trial. That evening, at 6:00 p.m., KSL TV reported in its newscast, in addition to various particulars of the trial:

Last year, Gatto and the two sons of alleged Mafia don Joseph Bonanno were charged by the FBI with allegedly operating another phony investment scheme involving patriotic posters.

The FBI alleged, in that case, that the Bonanno brothers and Gatto had used a Salt Lake company for that alleged scam.

On the morning of October 18, prior to resuming the trial, the court conducted a voir dire of the jury and asked the jury members if any of them had heard news reports of the trial or if anyone had told them of news reports or talked to them about such reports. One juror reported that her daughter had viewed a 10:00 p.m. television newscast and had remarked to her mother, "I bet I know what case you're on." One of the other jurors related that a fellow teacher had inquired of her, "Are you on the case about the gold mine?" In each instance, the jurors heeded the court's admonition and declined to discuss the case.

A *Deseret News* article dated October 18–19, 1983, reported the progress of the trial and, in addition, stated:

A Utah judge says he will not bar newspapers and broadcasters from reporting on theft suspect Charles Jerome Gatto's alleged Mafia connections unless such stories result in a mistrial.

. . . .

Judge Homer Wilkinson denied a defense motion seeking to keep the news media from reporting on possible ties between Gatto and reputed Mafia figure Joseph Bonanno Jr.

The FBI has alleged both Gatto and members of the Bonanno family ran an investment scam in California from a Salt Lake Company.

. . . .

"I think we have to do away with anything to do with Joseph Bonanno and organized crime because it will taint the jury," defense attorney Gil Athay told Wilkinson.

Reporters had earlier told Wilkinson they could not formally agree to any suggestion they refrain from reporting the Gatto-Bonanno connection.

Counsel for Gatto moved for a temporary restraining order and order to show cause, which were granted by the court at 5:05 p.m., October 18. Those documents were immediately served upon the various news media that appear in this proceeding as plaintiffs.

On the following morning, October 19, the court again conducted a voir dire of the jury, which disclosed that two additional jurors had had outside contact about the case. One reported that she had been approached by an unknown person just outside the courthouse on the evening of October 18 wanting "to ask [her] a couple of questions." The juror refused to talk to the person. A second juror reported that she had received a telephone call from a parent in Montana who had inquired if she was "on the case with the two Mafia guys?" The juror also declined to discuss the case.

Following the above-described voir dire, counsel for Gatto moved for a mistrial. The court denied the motion.

During the afternoon of October 19, the court held a hearing on the motion for preliminary injunction and restraining order. All parties to this proceeding presented evidence and made arguments. The court again requested that the news media voluntarily refrain from publishing or broadcasting information about Gatto during the trial that was not relevant or admissible at trial and that the prosecution stated it had no intention of attempting to place in evidence. The news media declined.

The trial court considered as alternatives to the issuance of a restraining order: (1) defendant's waiver of a jury trial, (2) se-

questration of the jury, (3) voluntary restraint, and (4) continued admonitions to the jury. The court discounted each of the alternatives, concluding that waiver of the jury was an unreasonable price for Gatto to pay; that sequestration was not a reasonable alternative, not only because of the expected length of the trial (four weeks), with the attendant high costs thereof, and the considerable hardship to the jurors should they be confined for such a long period of time, but also because sequestration at that stage of the trial might well have the effect of causing the jury to question the procedure and thus prejudice them against Gatto; that frequent, strong admonitions to the jury might well have a similar adverse effect upon the jury with resultant prejudice to Gatto; and that voluntary restraint was not to be expected from the media.

The pertinent findings of fact made by the trial court can be summarized as follows:

(1) [T]hat at least one juror had received information that a trial was in progress that in some manner concerned Mafia figures;

(2) that the news media did not intend to exercise restraint in disseminating reports of defendant Gatto's alleged connections with the Mafia or organized crime;

(3) that the alleged fact that defendant Gatto has connections with the Mafia or organized crime is not in the public domain, and no fact was presented which indicated a direct or indirect connection between defendant Gatto and organized crime; and

(4) that an association or connection of defendant Gatto with the Mafia or organized crime if brought to the attention of a juror would result in prejudice.

Thereupon, the trial court concluded that a restraining order was appropriate and necessary to protect Gatto's right to a fair

trial and that the news media should be restrained from reporting any alleged connections between Gatto and organized crime. The court then entered the following order:

1. That KUTV, Inc., Kearns-Tribune Corp., the Desert News Publishing Company, KSL TV, KCPX TV, the United Press International and the Associated Press are hereby permanently restrained and enjoined from broadcasting, publishing or otherwise conveying to the public any information concerning the Defendant's direct connection and/or association with the Mafia and/or organized crime, until such time as the jurors have retired to deliberate in this case.

The issue thus presented is the same as was addressed in the recent case of *KUTV, Inc. v. Conder*, [3] namely, whether a court may impose short-term, during-trial restraint on publication in the interest of assuring a defendant a fair trial by an impartial jury free from outside influences.

In *Conder*, the Court exhaustively reviewed the cases that bear upon the issue at hand, and made the observation that the case of *Nebraska Press Association v. Stuart* [4] was the closest United States Supreme Court precedent on its facts. In that case, the Nebraska Supreme Court approved a pretrial order of the trial court that prohibited the press from publishing certain facts about a murder case until after the jury was impaneled. The United States Supreme Court overturned the order because it was issued without a sufficient showing to satisfy "the heavy burden imposed as a condition to securing a prior restraint." [5] In so doing, the Court concluded that it "need not rule out the possibility of showing the kind of threat to fair trial rights that would possess the requisite degree of certainty to justify restraint." [6] In fact, the Court reversed the restraint because the facts did not meet a three-part test involving (1) the extent to which the

---

**3.** *Supra* note 1.

**4.** 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

**5.** *Id.* at 570, 96 S.Ct. at 2808.

**6.** *Id.* at 569–70, 96 S.Ct. at 2807–2808.

probable publicity threatened the fairness of the forthcoming trial, (2) "whether measures short of an order restraining all publication would have insured the defendant a fair trial," [7] and (3) whether the restraint would, in fact, have achieved the desired protection.

Similarly, this Court, in *Conder,* recognized that "there may be circumstances where a prior restraint of some sort would be justified in order to assure a defendant a fair trial," [8] but held the order in that case invalid "because it was not accompanied by the procedural formalities and evidentiary showings necessary to justify such a restraint." [9]

▮ All of the procedural formalities and evidentiary showings that were found to be lacking in *Conder* are present in this case. The trial court duly apprised the parties of its concern about the effect during-trial publicity would have upon Gatto's right to a fair trial. The media rebuffed the court's suggestion that voluntary restraint be exercised and broadly disseminated accounts of Gatto's alleged underworld connections and associations with organized crime figures, both on the first day of trial and the following day. This prompted the court to issue a temporary restraining order. After notice to the affected media, the court then conducted a full adversary hearing on the motion for preliminary injunction, wherein evidence was taken and exhaustive argument was permitted. The court thereafter ruled that the media was restrained and enjoined from disseminating any information concerning Gatto's connection with organized crime until such time as the jury had retired to deliberate. This Court's modification of the trial court's order was necessary to accomplish the intended purpose of the order and achieve the desired protection, the third test in *Nebraska Press, supra.* The media was disseminating information of an *indirect* connection or association with the Mafia by reporting that

"Gatto and two sons of alleged Mafia don, Joseph Bonanno, were charged by the FBI with allegedly operating another phony investment scheme." This information could have had the same prejudicial effect as references to Gatto's *direct* connection or association.

▮ The district court's order, as modified by this Court, is precise and narrowly drawn so as to extend no further than necessary to protect the defendant's right to a fair trial. The order does not inhibit the reporting of trial events; it only restrains the media from reporting extraneous information of a highly prejudicial nature during an ongoing trial. Furthermore, it is supported by specific findings of fact that meet the three-part test laid down in *Nebraska Press*: (1) the extent to which the media accounts threatened the fairness of the ongoing trial is clearly demonstrated by the successive voir dire examinations of the jury conducted by the court which revealed that the prejudicial information was reaching the members of the jury; (2) the conclusion reached that voluntary restraint, sequestration of the jury, further frequent admonitions to the jury and waiver of jury trial were not reasonable alternatives is well supported by the facts of this case and does not evidence an abuse of the court's discretion; and (3) the restraint would reasonably achieve the desired protection, preservation of the integrity of the jury.

The foregoing tests were clearly met by the particular facts of this case. Use of the term "Mafia" in almost any context is a guaranteed attention-getter. The word universally connotes a little-understood but fearsome and sinister underworld association. Use of the term by the media, unrelated as it was in any manner to the facts of the ongoing criminal trial, could only serve to invite even the most sophisticated jurors to conjecture about a defendant who has "Mafia connections."

▮ In addition, for purposes of our own constitutional direction that "[n]o law shall be passed to abridge or restrain the

---

7. *Id.* at 563, 96 S.Ct. at 2804.

8. 668 P.2d at 524.

9. *Id.*

freedom of speech or of the press," Utah Const. art. I, § 15, we add a fourth test pertaining to during-trial publicity: the degree of public interest in immediate access to the information that the proposed order would deny them for the duration of the trial. In this case, we perceive no significant public interest in immediate access to the sole subject of the restraining order: that Gatto, on trial for theft by deception, had some direct or indirect connection or association with organized crime. This case does not involve the trial of a public official, evidence of official misconduct or connections with organized crime. In those types of cases legitimate public interest is at its highest peak and the right to know could well outweigh competing interests and justify the expense and risk of sequestering the jury.

It is significant that the issue in this case concerns the propriety of *during-trial* publicity rather than pretrial publicity, the effect of which can be gauged and counteracted at the time the jury is selected. The jury having already been impaneled, the threat to fair trial rights is readily apparent should the jury become tainted by the ongoing dissemination of information pertaining to defendant's alleged "Mafia connections."

 We view this case as a classic example of a direct confrontation of free-press/fair-trial rights, and the circumstances that gave rise to this confrontation require that an accommodation be reached in favor of the defendant's due process right to a fair trial.

 In order to avoid implying that this precedent could become commonplace, we emphasize that orders imposing any prior restraints on the media can rarely be justified. Whatever their alleged justification, they will not be sustained by this Court unless they are accompanied by suitable written findings, so that the affected media can, if they desire, subject the order to immediate review.

The denial of the request for extraordinary relief is confirmed, and the petition for rehearing of the Court's order of October 21, 1983, is denied. No costs awarded.

OAKS, HOWE and DURHAM, JJ., concur.

STEWART, Justice (dissenting).

Four members of the Court sustain the constitutionality of a gag order prohibiting certain members of the press from publishing information about a defendant in a criminal trial. Since I believe that the order is prohibited by the First Amendment to the United States Constitution and Article I, § 15 of the Utah Constitution, I dissent.

### I.

"[T]he most serious and the least tolerable infringement on First Amendment rights" is a prior restraint. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683 (1976). In sustaining and even broadening the censorship order imposed by the trial court, the majority of this Court purports to apply the standards established by *Nebraska Press*. I respectfully submit, however, that the majority both misreads and misapplies *Nebraska Press* and also wholly fails to recognize the impact of its ruling on the doctrine of prior restraints generally and the legality of gag orders in particular.

*Nebraska Press* did not flatly prohibit all media gag orders in criminal trials, but the Supreme Court made clear that an order imposing a prior restraint on the press is justifiable only in the most extreme and extraordinary cases and only when other judicial remedies would not be adequate to assure the fair trial of an accused. "[T]he barriers to prior restraint remain high and the presumption against its use continues intact." *Id.* at 570, 96 S.Ct. at 2808. Indeed, even when the government has asserted that national security would be adversely affected by the publication of certain information, the Court has held injunctions against media publication unconstitutional. *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The majority of this Court, however, seriously enfeebles the presumption of invalidity because it fails to

require judicial resort to well-established remedies, short of a gag order, that would ensure a fair trial.

This is not a case where the First and Sixth Amendments are necessarily at loggerheads. The right to a fair trial and preservation of the freedom of the press could have been fairly and reasonably accommodated by sequestering the jury. The majority argues that sequestration is not practicable because "sequestration at that stage of the trial might well have the effect of causing the jury to question the procedure and thus prejudice them against Gatto." If that were true in this case, it would be true in almost every case involving prejudicial publicity, and sequestration would virtually never be appropriate. Certainly there is no evidence and no finding in this case that sequestration would create prejudice against the defendant. Surely the experience of many other jurisdictions, including the federal courts, which employ sequestration to insure fair trials, does not support the Court's assertion.

In my view the expense to the state and the inconvenience to jurors caused by sequestration is a small price to pay for freedom of the press. The rights enshrined in the Bill of Rights do on occasion cause inconvenience and expense. But considerations of inconvenience and expense pale in significance against the overarching importance of those fundamental values of our free society which are anchored in the Bill of Rights. The Florida Supreme Court in *State ex rel. Miami Herald Publishing Co. v. McIntosh,* Fla., 340 So.2d 904, 910 (1977) stated:

> The inconvenience suffered by jurors who are sequestered to prevent exposure to excluded evidence which may be published in the press is a small price to pay for the public's right to timely knowledge of trial proceedings guaranteed by freedom of the press. It is argued that a temporary withholding of news from the public may aid in assuring a fair trial and that if the State and defendant agree to muzzling the press no one else has a right to object. We firmly reject any suppression of news in a criminal trial except in those rare instances such as

national security and where a news report would obviously deny a fair trial as stated above in Federal cases.

## II.

Furthermore, the trial court's findings of fact do not justify the extreme measure of imposing a gag order. Rather, the findings demonstrate that the publicity objected to had not tainted the jury and that the possibility of tainting the jury was remote and speculative. The trial court found:

(1) [T]hat at least one juror had received information that a trial was in progress that in some manner concerned Mafia figures;

(2) that the news media did not intend to exercise restraint in disseminating reports of defendant Gatto's alleged connections with the Mafia or organized crime;

(3) that the alleged fact that defendant Gatto has connections with the Mafia or organized crime is not in the public domain, and no fact was presented which indicated a direct or indirect connection between defendant Gatto and organized crime; and

(4) that an association or connection of defendant Gatto with the Mafia or organized crime if brought to the attention of a juror would result in prejudice.

None of these findings indicate that any juror was aware that whatever he had heard that might have emanated from the media was related to the trial in which he was involved. None of the findings indicate that even if a juror might have heard something about the alleged connection between the defendant and the Mafia that that information might affect that juror's judgment. True, finding No. 4 states that "an association or connection of defendant Gatto with the Mafia or organized crime if brought to the attention of a juror would result in prejudice." Concededly, the term "Mafia," if connected with the defendant could prejudice the trial. According to the press accounts, however, the defendant was not directly connected with the Mafia, but was said to be a friend of a son of a Mafia figure. The reports did not state that the defendant himself was a member

of the Mafia, or even that he associated with a member of the Mafia. Be that as it may, the allegation could, of course, have been prejudicial if conveyed to the jury. Nevertheless, the trial judge could have addressed the problem by a curative instruction, or he could have declared a mistrial and either sequestered the jury in a subsequent trial or appointed additional alternate jurors to sit in the event of the disqualification of a juror.

In any event, the majority does not even address, much less determine, whether the gag order it sustains is justified by whether "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *Nebraska Press, supra,* 427 U.S. at 562, 96 S.Ct. at 2804 (quoting Learned Hand, J., *United States v. Dennis,* 183 F.2d 201, 212 (2d Cir.1950)). That test, adopted by the Supreme Court in *Nebraska Press* with respect to justifying curtailment of freedom of the press, is critical in determining whether a gag order is justified when all other alternative remedies for ensuring a fair trial have been found inadequate. Without even purporting to apply the test, the majority simply asserts that the invasion of the First Amendment right is justified. Since sequestration would have prevented the evil of prejudice, there was no justification whatsoever for the "invasion of free speech."

### III.

The majority's application of the Freedom of Press Clause in the Utah Constitution borders on being cavalier. In a wholly off-hand manner, the Court states with respect to the free press provision of the Utah Constitution, Article I, § 15: "[W]e add a fourth test pertaining to during-trial publicity: the degree of public interest in immediate access to the information that the proposed order would deny them for the duration of the trial. In this case, we perceive no significant public interest in immediate access to the sole subject of the restraining order: that Gatto, on trial for theft by deception, had some direct or indirect connection or association with organized crime."

In short, the majority simply bulldozes into the editorial process far beyond anything contemplated in *Nebraska Press,* even in the most extreme circumstances. The majority seeks to legitimatize judicial judgments on purely editorial matters that are far beyond the competence of any court. Deciding what is newsworthy and when it is newsworthy is simply not a judicial function. Judicial control of those decisions is raw censorship, pure and simple. In asserting power under the Utah Constitution to restrain the publication of information based on "the degree of public interest in immediate access to the information," the Court opens the censorship door wider than any conceivable legitimate judicial interest justifies—and wider than has heretofore occurred in this state or, to my knowledge, in any federal jurisdiction. Under the Court's new-found standard, it could almost always justify a gag order on the ground that the public could wait to receive whatever news is to be suppressed—but that totally ignores the realities of the process of news dissemination and is flatly at odds with the First Amendment and Article I, § 15.

I should have thought it axiomatic that it is for editors, not judges, to determine what, when, and how to publish. Concededly, what is published may in the eyes of the judiciary be prejudicial, sensationalistic, and unnecessary, but to others it may be highly informative and critical to public discussion.

In sum, I believe that the majority has basically ignored our nation's long-time aversion to prior restraint of speech and the press. There is no justification for imposing a gag order to ensure a fair trial in this case. Other judicial remedies were available and should have been employed to ensure that objective.

I think the gag order was unconstitutional.